UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| CARL G. SIMPSON, ET AL. | : | Case No. C-1-000014 |
| | : | |
| Plaintiffs, | : | Judge Dlott |
| v. | : | |
| | : | MOTION FOR SUMMARY JUDGMENT |
| INTERMET CORPORATION, ET AL. | : | OF DEFENDANTS INTERMET |
| | : | CORPORATION AND IRONTON IRON, |
| Defendants. | : | INC. |

Defendants Intermet Corporation and Ironton Iron Inc. move pursuant to Federal Rule of Civil Procedure 56(b) for summary judgment as to each of the claims against them. A memorandum in support of this motion is attached.

                                                                                                       Respectfully submitted,

                                                                   _s/ Patricia Anderson Pryor_
                                                                   Lawrence J. Barty (0016002)
                                                                   barty@taftlaw.com
                                                                   Patricia Anderson Pryor (0069545)
                                                                   pryor@taftlaw.com
                                                                   Taft, Stettinius & Hollister LLP
                                                                   1800 Firstar Tower
                                                                   425 Walnut Street
                                                                   Cincinnati, Ohio  45202-3957
                                                                   (513)  381-2838
                                                                   (513) 381-0205 (fax)

                                                                   Trial Attorneys For Intermet Corporation
                                                                    and Ironton Iron, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| CARL G. SIMPSON, ET AL. | : | Case No. C-1-000014 |
| | : | |
| Plaintiffs, | : | Judge Dlott |
| v. | : | |
| | : | DEFENDANTS INTERMET |
| INTERMET CORPORATION, ET AL. | : | CORPORATION AND IRONTON |
| | : | IRON, INC.'S MEMORANDUM IN |
| Defendants. | : | SUPPORT OF THEIR MOTION FOR |
| | : | <u>SUMMARY JUDGMENT</u> |

## I. INTRODUCTION

Defendants Intermet Corporation and Ironton Iron, Inc.,[1] (collectively referred to as "Intermet") respectfully submit that there are no genuine issues of material fact and summary judgment is appropriate with respect to all claims against them.

Carl D. Simpson ("Simpson") was employed by Intermet at its Ironton, Ohio foundry. Simpson, after unlocking and switching on all of the power sources to a Sutter mold manufacturing machine on which he was working and instructing a co-worker to reactivate the machine, climbed into the Sutter machine at Intermet, resulting in his death. Plaintiffs, the administrators of the estate of Simpson and Bonnie Reed *Simpson*[2] ("Reed"), filed this action for wrongful death against Intermet, Hayes-Lemmerz International Equipment and Engineering, Inc. (the re-manufacturer of the Sutter machine in question), and George Fischer DISA, Inc. (the

---

[1]  Ironton Iron, Inc. is a wholly owned subsidiary of Intermet Corporation.

[2]  Bonnie Reed now claims to have been Simpson's wife under a common law marriage. However, Simpson represented to others, including Intermet and the federal government, that he was single. (Reed Dep. 25; Reed Dep. Ex. 1, p. 9-10, 111, 121)

W0149731.2

original manufacturer of the Sutter machine). Intermet filed a cross claim of subrogation against Defendants Hayes-Lemmerz and George Fischer DISA. Hayes-Lemmerz filed a cross claim against Intermet for contribution. DISA has subsequently been voluntarily dismissed from the action. Summary judgment is appropriate as to all claims against Intermet.

## II. STATEMENT OF UNDISPUTED FACTS

### A. The Sutter Machines Are Installed At Intermet In 1992.

In 1992, Intermet purchased and installed two re-manufactured Sutter machines from Defendant Hayes-Lemmerz, which was at that time known as CMI (hereinafter referred to as "CMI"). (Cherry Dep. 8) CMI had converted the Sutter machine from a hot box to a cold box mold machine. The machines were designed to create molds, from which Ford truck I-Beams would be manufactured. (Id. at 17) Each Sutter machine had two working stations. (Id. at 7) The working stations were labeled A-1, A-2 and B-1, B-2. (Id. at 8)

### B. The Sutter Machines.

Each Sutter machine was run by an operator and a helper. (Brammer Dep. 9) To be qualified to operate a Sutter, an employee had to go through periodic certification on the machine. (Perdue Dep. 166) Intermet's maintenance team checked out the machines daily and performed regular maintenance on them. (Mullins Dep. 12; Brammer Dep. 23) Twice a year, maintenance employees would thoroughly review the machines and replace parts as needed from CMI. (Mullins Dep. 82)

The Sutter machine consisted of three parts relevant to this lawsuit: the gas head, cope and drag. The "gas head," which was dome-shaped and at the top of the machine, injected gas into the pattern to cure and harden the mold. (Cherry Dep. 121) The pattern was made up of

the cope and drag.  The "cope" was the top part of the mold pattern.  (Mullins Dep. 29, 64)  The cope had holes pierced through it so that the sand, resin and gas could be injected into the mold.  (Id. at 64)  The "drag" was the bottom half of the mold pattern.  (Id. at 64)

The I-Beam molds were made with sand.  The cope and drag of the Sutter machine closed together during the creation of the mold.  The mold pattern would start in the front of the machine, away from the operator station and fill with sand.  The pattern would then roll to the rear of the machine, where the operators worked, where it would be cured with gas from the gas head to harden the mold.  (Id. at 84-85)  The cope was then raised off the drag with hydraulics and pins would come up through the holes in the drag to lift the mold.  (Id.)  Two mechanical arms, called the unloader, would then enter the machine under the mold and lift the mold out of the machine.  (Id.; Brammer Dep. 43)  The cope would then lower back down to the drag and the pattern would return to the front of the machine, away from the operator, to once again be filled with sand and the process would be repeated.  (Cherry Dep. 44)

Periodically, during an employee's shift, the cope and/or drag would become clogged with sand (a condition which the workers called a "sticker"), causing flaws in the mold. (Brammer Dep. 37)  When this occurred, the employees would raise the gas head up a few feet until it connected with what was called the top lock.  (Id. at 71)  The top lock would hold the gas head up to prevent gravity from causing it to fall.  (Stapleton Dep. 17)  If the sticker was in the cope, the employee would lower the cope so that it was connected to the drag at the bottom.  (Id. at 18)

Whichever employee was going to lean into the machine to clean the sticker out would turn off the machine, by turning off and locking out the electric, hydraulic and pneumatic

power sources. (Brammer Dep. 72; Stapleton Dep. 18)[3/] The employee would then attempt to clean the sand sticker out of the machine, sometimes using a hammer and chisel to knock the sand loose. Once the "sticker" was cleaned out the employee had no further reason to enter the machine and the employee would unlock everything so that the machine could be re-energized. (Brammer Dep. 73)

        C.     <u>Intermet's Safety Efforts.</u>

Intermet required its supervisors to conduct monthly safety meetings with the employees. (Arthurs Dep. 11; Brammer Dep. 29) Employees could raise any safety concerns they had at these meetings and Intermet would address them. (Arthurs Dep. 33)

Intermet maintained a lockout program for all of its machines, including the Sutter machines. No employee was permitted to enter a machine with any part of his body until the energy sources were turned off and locked out: "That was practice at the Intermet Corporation. And failure to do so was subject to dismissal by supervisor or hourly employee." (Mullins Dep. 49) Employees were instructed to lockout the machines before entering them. (Arthurs Dep. 17, 33; Miller Dep. 26-27; Stapleton Dep. 10-11) No one was ever directed to enter a machine that was not locked out. (Arthurs Dep. 33, 34; Miller Dep. 33; Stapleton Dep. 16)

Employees were routinely trained on lockout/tagout procedures. Lockout/tagout requirements were covered in safety meetings two to three times a year. (Ramey Dep. 13) Bill Perdue, the Safety and Human Resources Supervisor, also conducted plant-wide training on lockout procedures. (Perdue Dep. 165)

---

[3/]    Relevant cited portions of the depositions of Frank Arthurs, Angela Cole, Scott Miller, Roger Ramey, Bonnie Reed, Jack Roop and Tom Stapleton are attached.

Intermet also conducted safety audits. (Id. at 23) Perdue performed daily walk throughs of the foundry to identify any visible safety concerns. (Id. at 25) Perdue also reviewed accident reports to determine if there were problems that needed to be addressed. (Id. at 24)

When Intermet discovered a potentially dangerous condition, Intermet took action to correct it. For example, Intermet instituted the use of steel safety bars to keep the gas head from falling due to gravity while the Sutter machines were locked out. (Roop Dep. 35; Cherry Dep. 19-20, 22) In 1998, after one of the bolts holding the gas head had broken, Intermet installed safety chains on all four corners of the gas head in case another bolt ever broke. (Id. at 23, 30)

    D.    Carl Simpson.

Intermet hired Simpson in 1992. (Am. Compl. 11) He received lockout training almost immediately. (Howell Dec. ¶ 4) Simpson worked on the Sutter machine for nearly four years. (Brammer Dep. 28) He received safety training, including lockout training, and he attended the monthly safety meetings. (Brammer Dep. 28-29; Perdue Dep. 62)

    E.    The Accident On September 21, 1999.

On September 21, 1999, the B-2 Sutter machine was running as well as it had ever run. (Brammer Dep. 33-34) Jamie Brammer was working as the operator on the B-2 Sutter machine. Brammer had also received lockout training, including machine specific training on the Sutter machines. (Id. at 13-14) Brammer was an experienced operator, who had worked on the Sutter since 1993. (Id. at 27) Simpson was the relief person assigned to the Sutter machines that day. (Id. at 36) As a relief person, Simpson would fill in for each operator and helper on the B-1 and B-2 machine during their breaks. (Id. at 32)

Simpson and Brammer had at least two stickers on the B-2 Sutter machine on September 21. (Id. at 39) Each time, they locked out before entering the machine. (Id. at 41, 42, 43, 72) The second sticker that Simpson cleaned out occurred between 8:30 a.m. and 9:00 a.m. (Id. at 43) The sticker was in the cope of the machine, so the cope was lowered down to the drag. Simpson locked the machine out, including the hydraulic, electric and pneumatic (air) energy sources. (Id. at 43, 72) He leaned into the machine and cleaned out the sticker with his hammer and chisel. (Id. at 57)

When Simpson was finished cleaning out the sticker, he unlocked the machine and put his hammer and chisel in a tray behind him. (Id. at 44, 57) Simpson then told Brammer: "Well, go ahead and raise up the machine." (Id. at 44) Simpson handed Brammer the key ring that the operators used to activate a solenoid valve located on the side of the machine. (Id.) The solenoid valve would raise the cope of the machine back up to the gas head to release the top lock, so that the machine could be placed back into a normal cycle. Brammer told Simpson he was going to go and "raise up the machine." (Id. at 44, 73) Simpson said "Okay". (Id. at 46) Brammer took the key ring Simpson had handed him and went to the side of the machine, where the solenoid valve was located. (Id.; Cherry Dep. 37) Before Brammer pressed the solenoid valve, he crouched down and looked through the machine between the blow tubes and saw Simpson standing on the other side. (Brammer Dep. 47-48, 52) Brammer raised up and pressed the solenoid. (Id. at 48)

During the brief time it took Brammer to raise up and press the solenoid valve, Simpson, for some unknown reason, inserted his upper body back into the Sutter machine. There was no logical reason for him to re-enter the machine. (Id. at 58, 67) The solenoid valve then

raised the cope of the machine up. Simpson, whose upper body was between the cope and the gas head, was fatally crushed.

### III. ARGUMENT

    A.    Summary Judgment Is Appropriate On Counts One, Two And Three Of Plaintiffs' Amended Complaint Against Intermet.

        1.    The Ohio Worker's Compensation Act Precludes This Action.

It is undisputed that the facts of this case are tragic. Hindsight being 20/20, there are likely things everyone involved would have done differently, including Mr. Simpson. Nevertheless, the tragic nature of the case is insufficient to create a jury question in federal court. Plaintiffs' remedy is found in the Worker's Compensation Act, not in federal court.

The Ohio Workers' Compensation Act precludes employees and/or their heirs from suing employers for injuries sustained in the workplace. "In exchange for the relative certainty of swift compensation provided by the system, employees relinquished their right to bring common law actions against their employers for injury and loss." Seth v. Capitol Paper Co., 1990 WL 125724 (Ohio Ct. App. 1990) (attached). Under Ohio Revised Code Section 4123.74, employers such as Intermet that comply with Section 4123.35 of the Revised Code "shall not be liable to respond in damages at common law or by statute for any injury, or occupational disease, or bodily condition, received or contracted by any employee in the course of or arising out of his employment, or for any death resulting from such injury, occupational disease, or bodily condition. . . ." O.R.C. § 4123.74.

Plaintiffs have alleged three separate causes of action against Intermet. Each of these claims are barred by Ohio Revised Code Section 4123.74. Intermet was a self-insured

employer in compliance with Ohio's Worker's Compensation Act at the time of Simpson's death. (Howell Dec. ¶ 2) Simpson's injury was received during the course of his employment at Intermet. Summary judgment is appropriate on Plaintiffs' claims against Intermet.

2. Plaintiffs Cannot Establish An Intentional Tort.

A narrow exception exists from the immunity provided to Intermet under Section 413.74 for injuries caused by an employer's intentional tort. Even assuming that Plaintiffs had properly alleged an intentional tort,[4] Plaintiffs cannot satisfy the stringent test required for such an action.

To establish an intentional tort claim Plaintiffs must establish: (1) knowledge by Intermet of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by Intermet that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that Intermet under such circumstances and with such knowledge did act to require the employee to continue to perform the dangerous task. Fyffe v. Jeno's Inc., 59 Ohio St. 3d 115, 570 N.E. 2d 1108 (1991) (syllabus). The Fyffe test is specifically designed to be a harsh test which significantly limits the factual situations where intentional tortious conduct by the employer may be inferred. Goodwin v. Karlshamns USA, Inc., 85 Ohio App. 3d 240, 619 N.E.2d 508 (1993). In order to establish an intentional tort, "proof beyond that required to prove negligence and beyond that to prove recklessness must be

---

[4] In Plaintiff's second cause of action against Intermet, Plaintiffs allege that Defendants violated R.C. §2745.01, the statutory codification of the intentional tort created by case law. R.C. §2745.01 has been declared unconstitutional in its entirety. See Johnson v. BP Chemicals, Inc., 85 Ohio St. 3d 298, 707 N.E.2d 1107 (1989). Plaintiff's second cause of action based upon this statute, therefore, fails as a matter of law.

established." Fyffe, 570 N.E.2d at 1112. "It is not enough to show that the harm was likely to occur or had a high risk of occurring." Jeffers v. Floyd S. Pike Electrical Contractor, Inc., 202 F.3d 268 (Table) (6th Cir. 2000) (attached). "[T]he mere knowledge and appreciation of a risk -- something short of substantial certainty -- is not intent." Fyffe, 570 N.E.2d at 1112.

a. Intermet Did Not Know That Harm To An Employee Was A Substantial Certainty.

There is no evidence that Intermet had actual knowledge that there was a substantial certainty that an employee would be harmed by removing a sticker from the Sutter machine. In order to succeed on an intentional tort claim, Plaintiffs must establish that Intermet "had actual knowledge of the exact dangers which ultimately caused" Simpson's injury. Sanek v. Duracote Corp., 43 Ohio St. 3d 169, 172, 539 N.E.2d 1114, 1116-17 (1989) (citations omitted).

It is undisputed that no other Intermet employee had ever been similarly injured in a Sutter machine.[5] The machines had been operating for seven years and stickers were often removed several times per shift. (Brammer Dep. 38) Simpson and Brammer removed the sticker and re-started the machine in the same way they had done it for years without ever having an accident. (Brammer Dep. 73-74) No one was ever similarly injured. The lack of similar injuries strongly suggests that Intermet did not have actual knowledge that an injury was substantially certain to occur. See Foust v. Magnum Restaurants, Inc., 97 Ohio App. 3d 451, 454 (1994)

---

[5] Two employees were previously injured on a Sutter machine, but in unrelated ways and while performing different tasks. Tom Slaughter caught his finger in a blow tube when he attempted to push the pattern box into the machine on the opposite side of the machine from where Simpson was working. (Ramey Dep. 100-101) Grady Runyon's hand was injured when the gas head fell after a bolt holding the gas head broke. (Brammer Dep. 11; Cherry Dep. 23, 30) Intermet fixed this condition by adding safety chains to hold the gas head up in case another bolt broke. (Cherry Dep. 30)

(showing of no prior accidents strongly suggests that "injury from the procedure was not substantially certain to result from the manner in which the job was performed"); Wehri v. Countrymark, Inc., 82 Ohio App. 3d 535, 538, 612 N.E.2d 791, 793-94 (1992) (showing of no prior accidents evidencing a dangerous condition curtails plaintiff's intentional tort claim); Grey v. Continental Alloy Steel Co., 70 Ohio App. 3d 425, 430, 591 N.E.2d 359, 362 (1990) (record devoid of any evidence that appellee had knowledge of any prior injuries).

Plaintiffs claim that Intermet did not enforce its lockout procedure and knew that employees sometimes removed stickers without locking out the machine. Even if that were true, that at most establishes knowledge of a risk. See Jandro v. Ohio Edison Co., 167 F.3d 309, 315 (6th Cir. 1999) (knowledge that lineman occasionally slid grounds, which caused decedent's death at most proved knowledge of risk). It does not establish that Intermet knew that injury was a substantial certainty. Id. The Ohio Supreme Court has made clear that actual knowledge requires more than an employer's failure to adopt or implement an effective safety program:

> There are many acts within the business or manufacturing process which involve the existence of dangers, where management fails to take corrective action, institute safety measures or properly warn the employees of the risks involved. Such conduct may be characterized as gross negligence or wantonness on the part of the employer. However, in view of the overall purposes of our Workers Compensation Act, such conduct should not be classified as an "intentional tort". . . .

VanFossen v. Babcock & Wilcox Co., 36 Ohio St. 3d 100, 117, 522 N.E.2d 489 (1988). See also Foust v. Magnum Restaurants, Inc., 97 Ohio App. 3d 451, 455 (Ohio Ct. App. 1994) (failure to insure employees use available safety equipment might indicate negligence, or even recklessness, but fell short of the higher standard of substantial certainty); Thomas v. Barberton Steel & Iron,

Inc., 1998 WL 150374 (Ohio Ct. App. 1998) (same) (attached); Bare v. Warren Consol. Ind., 2001 WL 1117051 (Ohio Ct. App. 2001) (summary judgment appropriate on intentional tort claim; although there was evidence that safety and lockout procedures were sometimes violated by employees, there was no evidence of other injuries or that employer discouraged use of safety procedures) (attached).

Simpson knew to follow the proper procedure before placing his body into the machine. (Miller Dep. 33)  No one could have predicted that Simpson would decide to place his body into the machine knowing that the power sources were back on, and after telling the operator to re-start the machine.  There is no evidence that any employee ever tried to re-enter a machine after unlocking it.  Even the employees who claimed they did not strictly following the lockout procedure admitted that they would never enter a machine with their head or upper body if the power switches had not been turned off.  (Stapleton Dep. 15; Cole Dep. 32)  Such conduct would be "suicidal." (Cherry Dep. 122)

"Under Ohio law, an employer who provides the necessary safety equipment [or procedures] is excused from liability for the unexpected actions of an employee." Jandro, 167 F.3d at 315.  Had Simpson followed the lockout procedures before re-entering the machine as he had been instructed and trained to do and as he had done in the past, he would not have been injured.  As in Jandro, Simpson's decision not to follow the safety procedures "was inescapably his own."  Id.  See also Neal v. McGill Septic Tank Co., 1998 WL 964505 (Ohio Ct. App. 1998) (a reasonable jury could not determine that employer knew that injury was substantially certain to occur; the general rule is "that an employer is not liable for the injuries the employee suffered on

an intentional tort theory where the employee voluntarily deviates from his employer's instructions or established operating procedure") (attached).

In <u>Jeffers v. Floyd S. Pike Electrical Contractor, Inc.</u>, 202 F.3d 268 (Table) (6th Cir. 2000) (attached), the Sixth Circuit affirmed an award of summary judgment to an employer in similar circumstances where a risk of injury was known if protective measures were not followed around energized power lines.  The foreman of the employees chose not to request that the lines the employees were working around be de-energized, chose not to order the employees to wear their protective gloves and clothing and chose not to use protective sheathing.  The Sixth Circuit stated:

> The failure to do any of these, or all of them together, may constitute negligence or even reckless behavior, but it does not prove Pike Electrical knew such injury was certain or substantially certain to occur.
>
> Likewise, no evidence supports the conclusion that Pike Electrical engaged in any egregious conduct.  The Ohio courts have found that the requirements of the employer intentional tort exception were not met under more flagrant conduct on the part of the employer than that present in the current case.

<u>Id.</u>

Intermet did not know that harm to an employee was a substantial certainty or that an employee would place his head or body into a machine that was turned on and that was about to be re-energized.  Plaintiffs cannot establish an intentional tort.  Summary judgment is appropriate on Counts One, Two and Three of the Amended Complaint against Intermet.

        b.        Simpson Was Not Required To Enter A Sutter Machine That Was Not Locked Out; In Fact He Was Specifically Instructed Not To Enter Such A Machine.

Even if Plaintiffs could establish that Intermet had knowledge that harm was a substantial certainty, Plaintiffs' claims fail for the independently dispositive reason that Plaintiffs cannot establish that Intermet required Simpson to perform an act that was substantially certain to cause harm.

Intermet did not require Simpson to enter a machine that was not locked out, particularly one which he had just instructed his helper to re-activate. Simpson should not have re-entered the Sutter machine after he (1) unlocked all of the power sources; (2) turned all three power sources on; and (3) told his partner to re-energize the machine. Absent this reckless and unheard of behavior, Simpson would be alive today.

Intermet never required or told anyone to enter a machine under any of these conditions, let alone all three. In fact, Intermet expressly told employees to lockout before ever entering a machine. (Arthurs Dep. 17, 33; Miller Dep. 26-27; Stapleton Dep. 10-11) Employees were trained on lockout procedures two to three times per year. (Ramey Dep. 13) Cleaning out a sticker with the machine locked out was not a dangerous task (Perdue Dep. 118-19); the dangerous task was entering the machine without the machine being locked out and with the power on. Intermet did not <u>require</u> Simpson to perform this dangerous task. See <u>Jandro</u>, 167 F.3d at 316 (employee was not required to perform job without safety equipment); <u>Crissinger v. Turn-All Machine & Gear Co.</u>, 1999 WL 279514 (Ohio Ct. App. 1999) (company did not require plaintiff to wear gloves that caused injury and cautioned her against doing so; summary judgment

appropriate where there was no evidence that accident would have occurred if plaintiff followed company policy) (attached).

In a similar case, Floyd v. Master Industries, Inc., 1999 WL 1127395 (Ohio Ct. App. 1999) (attached), an employee was crushed in a mold machine in which the rear gate/guard had been modified by the employer to allow the machine to cycle with the gate/guard open. The employee had been told that no one was to perform work in the machine unless the front gate of the machine was open, the pump motor was shut off, the machine was shut off, the machine was placed in manual operation mode and the operator was informed the work was being performed. The employee did not engage in these safety mechanisms. The evidence showed that had these measures been followed, the accident would not have happened. The court granted summary judgment because the third prong of the Fyffe test had not been met: "there is no evidence in the record to indicate that Master Industries required Floyd to perform his job without taking the appropriate safety precautions; to the contrary, he was trained to use numerous safety precautions, but chose not to." Id.

Similarly, in King v. Hancock Mfg. Co., 1999 WL 1243313 (Ohio Ct. App. 1999) (attached), the court granted summary judgment on an intentional tort claim brought by an employee who was injured when he removed scrap metal from a chute with his hands while the machine was running. The plaintiff claimed that management knew employees used their hands to dislodge scraps and that because production was such a priority, plaintiff did not feel comfortable shutting his machine off to safely remove the scrap. The court found that there was no evidence that harm was substantially certain to occur or that the employer required the employee to perform the job in a manner that was substantially certain to cause harm:

> It is apparent that appellant himself knew that he should have used his wooden stick to clear the metal from the chute. In fact, he trained his coworker to use said stick. Appellant was a fairly experienced operator who worker on a machine that contained a warning about cleaning the machine while it was running.
>
> Furthermore, no reasonable interpretation of the evidence would lead rational minds to conclude that Hancock required, instructed or encouraged appellant to clean scrap metal from the chute with his hands. There is no implied intent to injure merely because appellant used a dangerous method to perform one of his job duties, especially where safe alternative methods existed of which appellant was aware.

Id. (citations omitted).

Simpson had worked on the Sutter machine for four years. (Brammer Dep. 28) He had received training on the lockout procedure. (Brammer Dep. 28-29; Perdue Dep. 62) He had used the procedure correctly in the past and, in fact, had properly locked out the machine on the day in question. (Brammer Dep. 42, 43, 72) He knew he should not re-enter the machine once it was unlocked and the power was turned back on. Intermet did not require him to perform this dangerous task.

Plaintiffs cannot establish that Intermet committed an intentional tort. Summary judgment is appropriate with respect to Counts One, Two and Three of the Amended Complaint against Intermet.

   B.  <u>Summary Judgment Is Appropriate On Reed's Loss Of Consortium Claim.</u>

In addition to the three claims for wrongful death brought by the administrators of Simpson's estate, Bonnie Reed has alleged loss of consortium. Reed's loss of consortium claim similarly fails as a matter of law.

1.  The Loss of Consortium Claim Is Barred By
    Ohio's Worker's Compensation Act.

Reed's loss of consortium claim fails for the same reasons as the wrongful death claims fail. "A wife may not maintain an action against an Ohio employer who has complied with the Workers' Compensation Act of Ohio to recover damages for an alleged loss of consortium. . . .where such loss of consortium has resulted from a compensable occupational [injury or] disease of her husband occasioned in the course of and arising out of his employment in Ohio by such employer." Bevis v. Armco Steel Corp., 156 Ohio St. 295, 102 N.E.2d 444 (1951). Any loss of consortium resulted from Simpson's injury and death, which was a compensable occupational injury occasioned in the course of Simpson's employment. Summary judgment is appropriate on Reed's loss of consortium claim.

2.  Simpson's Death Negates A Loss Of Consortium
    Claim.

Even if Reed's loss of consortium claim was not barred by Ohio Worker's Compensation Act, the Ohio Supreme Court has held that a wife does not have an independent cause of action for loss of consortium against a person who caused her husband's instantaneous death. See DeWitt v. B&C Machine Co., 25 Ohio St. 2d 40, 266 N.E.2d 563 (syllabus) (1971).

3.  Bonnie Reed Was Not Simpson's Spouse.

Even if a loss of consortium claim were cognizable under the circumstances here, Reed's claim fails because she was not Simpson's spouse. A loss of consortium claim is a claim to protect the marital relationship. See Haas v. Lewis, 8 Ohio App. 3d 136, 137, 456 N.E. 512, 513 (1982). An essential element of such claim is that a marriage existed at the time of the injury

between the injured party and the party seeking damages.  Id.  "[T]he right of consortium is not conferred upon partners to extramarital cohabitation."  Id.

Although Reed claims that she and Simpson had a common law marriage, there is no evidence of this marriage prior to Simpson's death.  Simpson filed a single tax return.  (Reed Dep. 25)  He listed Reed as a "friend" on his life insurance policy completed just one year before his death.  (Howell Dec. ¶ 7, Ex. 3)  He certified to Intermet that he was not married on his retirement beneficiary designation.  (Id. ¶ 6, Ex. 2)  In the Probate Court filings in connection with Simpson's estate, Reed and Carl G. Simpson (Simpson's father) signed a statement that "[t]here are minor children of the decedent and no surviving spouse."  (Reed Dep. Ex. 1, p. 9-10)  On the deed to Simpson's property, which he obtained in 1997, he is listed as "unmarried."  (Reed Dep. Ex. 1, p. 111)  Similarly, on the deed to property he obtained in 1996, he is listed as "single." (Reed Dep. Ex. 1, p. 121)  Reed was not Simpson's spouse at the time of his injury.  Her loss of consortium claim fails as a matter of law.

        C.    Summary Judgment Is Appropriate On The Contribution Cross-Claim Brought By Defendant Hayes-Lemmerz.

Defendant Hayes-Lemmerz filed a cross claim against Intermet seeking contribution.  Employers are granted immunity from suit for any injury received in the course of employment.  O.R.C. 4123.74.  The Supreme Court in Blankenship v. Cincinnati Milacron Chemicals, Inc., 69 Ohio St. 2d 608, 433 N.E.2d 572 (1982), created an exception from this immunity for the liability of an employer *to an employee* for the employer's intentional torts.  However, the exception for employer liability is limited to suits *brought by employees* for intentional torts.  The exception does not extend to claims of contribution.  See McPherson v.

Cleveland Punch & Shear Co., 816 F.2d 249, 253 (6th Cir. 1987); Perry v. S.S. Steel Processing Corp., 40 Ohio App. 3d 198, 201-02, 532 N.E.2d 783, 786-87 (1987).  Summary judgment is appropriate on the cross-claim of Hayes-Lemmerz.

## IV.  CONCLUSION

For each and every of the foregoing reasons, Defendants Intermet Corporation and Ironton Iron, Inc., respectfully request that summary judgment be granted in their favor on each of the claims against them in this action.

Respectfully submitted,

  s/ Patricia Anderson Pryor
Lawrence J. Barty (0016002)
barty@taftlaw.com
Patricia Anderson Pryor (0069545)
pryor@taftlaw.com
Taft, Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, Ohio  45202-3957
(513) 381-2838
(513) 38l-0205 (fax)

Trial Attorneys For Intermet Corporation
and Ironton Iron, Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that on May 3, 2004, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: Randall L. Lambert and D. Scott Bowling, Attorneys for Plaintiff, 215 South Fourth Street, P.O. Box 725, Ironton, Ohio 45638; and Nancy J. Bride, Greenbaum Doll & McDonald PLLC, 255 East Fifth Street, Suite 2800, Cincinnati, Ohio 45202-4728.

    /s Patricia Anderson Pryor
Patricia Anderson Pryor
Taft, Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202-3957
(513) 381-2838
(513) 38l-0205 (fax)