IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION
CASE NO. C-1-00-0014

CARL G. SIMPSON AND BONNIE REED
SIMPSON, CO-ADMINISTRATORS
OF THE ESTATE OF CARL D. SIMPSON,

    Plaintiffs,

vs.

INTERMET CORPORATION, ET AL.,

    Defendants.

COPY

The deposition of Scott Miller was taken on October 15, 2001, at the approximate hour of 2:20 p.m., at the law office of Lambert, McWhorter & Bowling, 215 South Fourth Street, Ironton, Ohio.

ELITE COURT REPORTING
13 Carriage Way
Hurricane, West Virginia 25526
(304) 757-1122

Michelle Curry Johnson, Reporter

---

Page 2

**Appearances:**

    Mr. D. Scott Bowling
    Mr. Randall L. Lambert
    Attorneys at Law
    Lambert, McWhorter & Bowling
    P.O. Box 725
    Ironton, Ohio 45638

    Mr. Lawrence J. Barty
    Attorney at Law
    1800 Firstar Tower
    425 Walnut Street
    Cincinnati, Ohio 45202-3957

    Ms. Nancy J. Bride
    2800 Chemed Center
    255 East Fifth Street
    Cincinnati, Ohio 45202-4728

    Mr. Robert A. Flaugher
    Attorney at Law
    175 South Third Street, Suite 700
    Columbus, Ohio 43215-5100

**Also Present:** Mr. Kenneth McKibben

INDEX

| WITNESS | EXAMINATION BY | PAGE NO. |
|---|---|---|
| Scott Miller | Mr. Bowling | 03, 38 |
| | Mr. Barty | 32 |
| | Ms. Bride | 34, 41 |
| | Mr. Flaugher | 35 |

| EXHIBITS | | PAGE NO. |
|---|---|---|
| None | | |

Reporter's Certification - 43
Errata Sheet/Signature Page - 44/45

---

Page 3

    1    SCOTT MILLER, called as a witness, first being
    2  duly sworn by the Court Reporter/Notary Public, testified
    3  as follows, to wit:
    4                DIRECT EXAMINATION
    5  BY MR. BOWLING:
    6    Q.    Go ahead and just state your name and
    7  business address or home address, either one.
    8    A.    Scott Miller. ███████████
    9  Carlisle, Kentucky.
  10    Q.    Is that your home or business?
  11    A.    That is my home.
  12    Q.    Okay. Ever given a deposition before?
  13    A.    No.
  14    Q.    Just some ground rules, so we can get our
  15  records straight. She is going to take down everything you
  16  say. I want you to make sure you understand my questions
  17  before you answer. If you answer, I will assume that you
  18  understood the question; is that fair?
  19    A.    Yes.
  20    Q.    And the other thing is you need to answer
  21  your questions in yes or no, if applicable, or a verbal
  22  response, not uh-huh or huh-uh because, while I can
  23  communicate with you and understand what you are saying, it
  24  may not be clear on the record. Okay?

Page 25

```
1   they knew that I didn't believe in getting in a machine
2   without a lock being on.
3       Q.      Okay.
4       A.      So that, I didn't encounter.
5       Q.      Okay. What about using the safety bars?
6   Were they always used? Were they optional? What was the
7   position?
8       A.      There under my supervision while I was
9   around the machines, they were used.
10      Q.      Okay. Did any of the employees ever come to
11  you complaining about safety issues regarding the pinch
12  points on the Sutter machines?
13      A.      With this being a union facility, employees
14  tend to complain a lot more than at another facility. So
15  they would complain about a rock being on the floor, let
16  alone pinch points.
17      Q.      So they did complain about the pinch points
18  on the subject?
19      A.      They complained about everything.
20      Q.      Okay.
21      A.      I mean, it is not-- it wouldn't be fair to--
22  I have been in four or five different foundries, and this
23  was a very hostile working environment.
24      Q.      As between union and management?
```

Page 26

```
1       A.      Yes, sir.
2       Q.      Okay. I mean, I have got affidavits from
3   several of the employees, hourly folks, indicating they
4   complained about the pinch points on the Sutter machines.
5   From what you are telling me, there would be individuals
6   complaining about the pinch points on the Sutter?
7       A.      To me, nothing was said to me. As I was
8   saying before, there were complaints about everything.
9       Q.      Who would they complain to as it relates to
10  pinch points on the Sutter?
11      A.      Whoever would listen.
12      Q.      Okay.
13      A.      Everybody. The reason I left this facility
14  is because it was becoming very, very dangerous to work at.
15      Q.      What do you mean by that?
16      A.      Not really dangerous. It was becoming very
17  argumentive.
18      Q.      A hostile work environment?
19      A.      Yes, between union and the company.
20      Q.      Would you agree basically that the removal
21  of the stickers in the Sutter machines were part of the
22  normal operations of the Sutter?
23      A.      Yes.
24      Q.      It's part of Internet's policy and procedure
```

Page 27

```
1   to have the operators and the helpers to remove the
2   stickers?
3       A.      Yes, as well as locking out their machines.
4       Q.      Right. What was your understanding as to
5   the lockout protocol as far as how--
6       A.      Everyone who was entering a machine or a
7   pinch point was to lock out the hydraulics and the air.
8   They were not to take the locks off until they had removed
9   themselves and their tools from the pinch points in the
10  machines.
11      Q.      Did you know Carl Stapleton to be a
12  relatively--
13          MR. BARTY:   Simpson.
14          MR. BOWLING: What did I say?
15          MR. LAMBERT: Stapleton.
16          MR. BOWLING: I'm sorry.
17      Q.      Did you know Carl Simpson to be a relatively
18  safe individual?
19      A.      Yes.
20      Q.      Did he exercise the policies and procedures
21  as he understood them at Ironton Iron?
22      A.      Under my supervision, yes.
23      Q.      You had mentioned that you never encountered
24  your employees under your supervision energizing the Sutter
```

Page 31

```
 1     A.    That the machine is in operation, you mean?
 2     Q.    Right before coming out of a shutdown phase
 3  that there would be either a horn to indicate that the
 4  machine was coming out of shutdown or some type of light to
 5  indicate that the machine was about ready to re-energize?
 6     A.    No.  I have never heard anything like that
 7  with these machines, no.
 8     Q.    Would you agree that an individual
 9  activating the hydraulic solenoid valve has very limited
10  visual line of visibility back to his helper when he has to
11  go to activate the hydraulic valve?
12     A.    Could you-- do you mean can the guy see his
13  helper if he hits the valve?
14     Q.    Yes.
15     A.    Yes.  He can see them.
16     Q.    I mean, would you have to basically squat
17  down and look throughout the Sutter machine?  Is that about
18  the only way you can see through that area?
19     A.    Correct, yes.  Correct.
20     Q.    Visibility is not good.  You have to-- I
21  think it has been described today that you have to get into
22  an awkward position looking down before you--
23     A.    Yes.  You would have to bend your head over
24  and look to see.
```

Page 32

```
 1           MR. BOWLING:  That is all I have right
 2  now.
 3           MR. BARTY:  I have a few questions.
 4                CROSS-EXAMINATION
 5  BY MR. BARTY:
 6     Q.    I think you testified earlier that you had
 7  never observed an employee putting themselves into the
 8  machine without it being locked out?
 9     A.    Yes, sir.
10     Q.    Have you ever personally put yourself into a
11  machine without being locked out, a Sutter?
12     A.    No.  Absolutely not.
13     Q.    It would be obviously unsafe to do that?
14     A.    Yes, sir.
15     Q.    Okay.  Mr. Simpson, how long had he been
16  operating that machine?
17     A.    I wasn't there.  You mean that day?
18     Q.    No.  I mean in his career there at Intermet.
19     A.    I don't know the exact date he was hired.  I
20  believe he worked at a different part of the plant.  When I
21  was there, I believe he worked a couple of months.
22     Q.    Okay.  Did you see him operating the
23  machine?
24     A.    Yes.
```

Page 33

```
 1     Q.    Did you see him locking out the machine from
 2  time to time?
 3     A.    Yes.
 4     Q.    Were Sutter operators given training
 5  concerning lockout?
 6     A.    Yes.
 7     Q.    Was it clear to them they had to lock out
 8  the machines before they entered it?
 9     A.    Yes.
10     Q.    A former employee named Tom Stapleton said
11  that the foremen routinely gave people orders not to lock
12  out the machine when they were cleaning out stickers.  Do
13  you believe that to be true?
14     A.    From this supervisor, no.
15     Q.    You were the general foreman for some period
16  of time there?
17     A.    Yes.
18     Q.    You are the person who gave orders to the
19  line foremen?
20     A.    Yes, sir.
21     Q.    Did you ever give any such order?
22     A.    No, sir.
23     Q.    Did anybody ever, higher up in management,
24  ask you to order your foreman to tell people not to lock
```