```
 1                UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF OHIO
 2                      WESTERN DIVISION

 3
        * * * * * * * * * * * * * * *
 4      CARL G. SIMPSON, et al.,       *
                                       *
 5              Plaintiffs,            *
                                       *   Case No.: C-1-00-0014
 6      vs.                            *
                                       *
 7      INTERMET CORPORATION, et al., *
                                       *
 8              Defendants.            *
        * * * * * * * * * * * * * * *
 9

10

11

12      DEPONENT:         JACK ROOP

13      DATE:             NOVEMBER 16, 2001

14      TIME:             9:10 A.M. - 12:00 P.M.

15      LOCATION:         AIRPORT HOLIDAY INN
                          SUITE 218
16                        ROANOKE, VIRGINIA

17      REPORTED BY:      CYNTHIA N. STILES
                          COURT REPORTER
18                        NOTARY PUBLIC IN AND FOR THE
                          STATE OF VIRGINIA AT LARGE

19

20

21

22

23

24

25
```

```
                                                    Page 2
 1              APPEARANCES
 2
 3  For the Plaintiff:    RANDALL LAMBERT, ESQUIRE
                          C. SCOTT BOWLING, ESQUIRE
                          Lambert, McWhoter & Bowling
 4                        Attorneys at Law
                          Lambert Building
 5                        215 South 4th Street
                          Ironton, Ohio 45638
 6
 7  For the Defendant:    LAWRENCE J. BARTY, ESQUIRE
                          Taft, Stettinius & Hollister
 8                        Attorneys at Law
                          1800 Star Bank Center
 9                        425 Walnut Street
                          Cincinnati, Ohio 45202-3957
10  For the Defendant:    ROBERT A. FLAUGHER, ESQUIRE
                          Lane, Alton & Horst
11                        Attorneys at Law
                          175 South Third Street
12                        Columbus, Ohio 43215-5100
13  For the Defendant:    NANCY J. BRIDE, ESQUIRE
                          Greenbaum, Doll & McDonald
14                        Attorneys at Law
                          2800 Chemed Center
15                        255 East Fifth Street
                          Cincinnati, Ohio 45202-4728
16
    Also Present:         Al Gould, Hayes Lemmerz
17
18              I N D E X
19  Examination:                              Page
20    Direct by Mr. Lambert                     5
      Cross by Mr. Flaugher                    81
21    Cross by Ms. Bride                       95
      Cross by Mr. Barty                      102
22    Redirect by Mr. Lambert                 103
23
24              E X H I B I T S
25              (NONE)
```

```
                                                    Page 3
                    STIPULATION

     It is stipulated by and between the parties hereto
and their respective attorneys at law that the
deposition on oral examination of the witness, JACK
ROOP, may be taken before Cynthia N. Stiles, Notary
Public, State of Virginia at Large, and that the said
deposition shall be taken in accordance with, and, when
so taken, may be used in accordance with the provisions
of the Federal Rules of Civil Procedure.

     It is further stipulated that the witness will not
waive reading and signing said deposition upon its
completion.
```

Page 4

 1              JACK ROOP,
 2  having been first duly sworn to speak the truth, the
 3  whole truth, and nothing but the truth, testified as
 4  follows:
 5              DIRECT EXAMINATION
 6  BY MR. LAMBERT:
 7     Q  Mr. Roop, my name is Randall Lambert.  With
 8  me is Scott Bowling.  We represent the Simpson family in
 9  the case that's pending in district court in Cincinnati.
10  We're here today to take your deposition and ask you
11  some questions about some things you may know about some
12  of the facts or instances involved in this litigation.
13         First of all, sir, have you ever had your
14  deposition taken before?
15     A  No, sir.
16     Q  I always tell everybody this is something
17  everyone should do once in their life.  This may be your
18  only opportunity, so we'll try to make it as enjoyable
19  for you as possible.
20         There are ground rules I'd like to give you
21  to follow.  This lady is taking down everything that you
22  and I say.  I'm sure it will be ordered and put into a
23  booklet or transcript form, so everybody here can read
24  it.
25         In order for us to be able to read it and

Page 5

 1  understand it, we have to follow these guidelines.  No.
 2  1 is always answer audibly yes or no or give a verbal
 3  answer.  We can't shake our heads or say uh-uh or
 4  uh-huh, as we do back where we're from.
 5         Another instruction is allow me to finish my
 6  question before you start answering, and I will allow
 7  you to finish your answer before I start another
 8  question.
 9         The last instruction is make sure you
10  understand the question before you answer it, so if we
11  read it later and we read an answer that you give, we
12  will be able to assume that you understood what the
13  question was when you gave your answer.
14         If you don't understand, let us know and we
15  will try to restate it, rephrase it or ask it again in a
16  way that you can understand, okay?
17     A  Okay.
18     Q  Give us your name and your address for the
19  record.
20     A  It's Jack Roop.  I live at ███████████,
21  Phoenix City, Alabama.
22     Q  And what is your business address?
23     A  Business address is 1600 Industrial --
24  Northside Industrial Boulevard, Columbus, Georgia.
25     Q  Do you have an extra one of those cards?

Page 34

1 Sutter machine, would you report them to him or would
2 you go straight to CMI?
3  A  I'd go to Bob.
4  Q  Once you saw the machines and started the
5 installation, did you bring any safety concerns to the
6 attention of Mr. McMillan or anyone else regarding the
7 operation of the machine?
8  A  I'm not sure that I did individually, but
9 there were items that we discussed.
10  Q  What were those items?
11  A  The one that I recall was the locking out of
12 the machine to keep the box in the up position.
13  Q  The gas head?
14  A  Yes.
15  Q  You don't recall who brought up that concern?
16  A  No, I don't recall.
17  Q  To your knowledge, was that relayed by
18 McMillan to CMI?
19  A  Yes.
20  Q  What, if anything, was done design-wise or
21 operational-wise on the machine to answer that safety
22 concern?
23  A  We reviewed -- we talked with CMI. There was
24 conversation back and forth about different ways to lock
25 the machine in the up position, and I was told to design

Page 35

1 something that was capable of being locked in place and
2 not removed without taking physical locks off of it that
3 would keep that box up in the up position.
4  Q  Okay. What -- go ahead.
5  A  I designed two tubular steel bars that were
6 anchored at the front and the back of the machine. The
7 bar slid through a clip in the front of the machine into
8 a clip on the back of the machine, and the lock was
9 placed on it where it could not come through, and there
10 was one on either side of the box. There were two on
11 each machine.
12  Q  This would keep the gas head from dropping
13 when the machine was not in cycle?
14  A  Right. If the top locks would fail, the box
15 would stay in place.
16  Q  Was that designed at the time the machines
17 were initially installed?
18  A  It was shortly, it was shortly after. They
19 weren't in production, I don't think, when we put the
20 bars on. It was before I left up there, anyway.
21  Q  We've got some photographs I want you to look
22 at to make sure we're talking about what I think, the
23 bars that I think we're talking about.
24   While Scott is finding those photographs, we
25 have a drawing that's part of exhibit -- Nancy, do you

Page 36

1 all remember which exhibit that is?
2   MS. BRIDE: Is that R something? No, R is
3 the photograph.
4   MR. FLAUGHER: J.
5 BY MR. LAMBERT:
6  Q  We're trying to keep from having so many
7 copies.
8   Exhibit J, page 15 is a copy of a drawing,
9 rough drawing that was made, I believe it was made by
10 someone with OSHA, actually, that we've been using as a
11 general description of the main components, I think I
12 could say, of the Sutter machine, so we can know we're
13 talking about the same thing, as far as the location of
14 the gas head, the cope and the drag.
15   Would this drawing appear to be accurate, as
16 far as the relationship of those main components with
17 each other?
18  A  Uh-huh.
19  Q  Is that yes?
20  A  Yes.
21  Q  We also have some photographs in Exhibit R,
22 and Photograph 5 of Exhibit R shows some bars that are
23 connected to the top of the machine. They come down and
24 have another bar running through them. According to the
25 other witnesses, these bars are placed there to keep the

Page 37

1 gas head from dropping down.
2   What I want to know is are those the safety
3 bars you're referring to, or is this something that was
4 installed after your involvement with the machine?
5  A  No, I think these are the same bars.
6  Q  Do you know whether or not those were
7 installed after there was an injury to someone by the
8 gas head dropping?
9  A  Well, while I was there there were no
10 injuries on the machine, and they were installed before
11 I left up there, so.
12  Q  The bars that were installed, that are shown
13 in Photograph 5, the purpose of those bars was to keep
14 the gas head from dropping, correct?
15  A  Right, if the top locks failed.
16  Q  They would not keep the cope from rising up
17 to the gas head, except for keeping it an inch or so
18 away, correct?
19  A  Right. As far as I know, yes.
20  Q  The way it was designed, it was not designed
21 to do that, to keep the cope from rising?
22  A  Yes.
23  Q  While you were there during the installation,
24 I assume the machines were operated for a period of time
25 before you left?