IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

CARL G. SIMPSON AND BONNIE REED
SIMPSON, CO-ADMINISTRATORS OF          CASE NO.:  C-1-00014
THE ESTATE OF CARL D. SIMPSON

     PLAINTIFFS                          JUDGE J. DLOTT

VS.

INTERMET CORPORATION, ET AL.

     DEFENDANTS
_____

*MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS, INTERMET CORPORATION AND IRONTON IRON, INC.*

Now come Plaintiffs, by and through counsel, setting forth their Memorandum in Opposition to the Motion for Summary Judgment filed on behalf of Defendants, Intermet Corporation and Ironton Iron, Inc., responding that:


**I.**    **INTRODUCTION**

Carl D. Simpson ("Simpson") was employed by Intermet at its Ironton, Ohio foundry.  Simpson, as an employee of Defendants, Intermet Corporation and Ironton Iron, Inc., ("Intermet"), was a helper/operator of the Sutter mold manufacturing machines at Intermet.  Simpson, as a helper/operator of the Sutter machines, was required to enter into the various pinchpoints in the Sutter machines to remove clogged sand (a condition which the workers called a "sticker").  By performing this task as he was trained and required to do by Intermet, Simpson was fatally crushed on September 21, 1999.  The facts as more thoroughly set forth below will show that there is a genuine issue as to whether Intermet committed an intentional tort as set forth by the

1

Ohio Supreme Court in <u>Fyffe v. Jeno's, Inc.</u> (1991) 59 Ohio St. 3rd 151.

## II.    <u>STATEMENT OF FACTS</u>

### A.    *Uncontested Facts*

The facts as set forth by Intermet under Subsections A and B on pages 2 and 3 of their Memorandum are relatively accurate and deserve no additional discussion. However, the remaining facts as set forth in Intermet's Motion for Summary Judgment are completely disputed by the Plaintiffs and these disputes create genuine issues of material fact, making summary judgment inappropriate in this case.

### B.    *The death of Carl Simpson on September 21, 1999.*

Intermet relies almost entirely on Jamie Brammer's version of the events which led to Carl Simpson's death. Jamie Brammer was the operator of the B-2 Sutter machine the day Simpson was killed. (Brammer, p. 13)[1] Unfortunately for Mr. Brammer, he, like Simpson, was placed under circumstances that made injury or death to Simpson a substantial certainty. Two additional co-workers were at a closer proximity to Carl Simpson at the time of the accident than was co-worker, Jamie Brammer. On this day, Thomas Stapleton was the operator of the B-1 Sutter machine and Mr. Simpson was the helper on the B-2 Sutter machine. (Stapleton, p. 29). Mr. Stapleton, as the operator of the B-1 Sutter machine, faced in a direction toward the B-2 Sutter machine on which Mr. Simpson was the helper. (*Id.*). Mr. Stapleton's helper was Paul Kelley, who

---

[1] Relevant cited portions of the depositions are attached hereto and marked as "Exhibit 1".

had his back turned to Mr. Stapleton. (*Id.*, p. 30).

Immediately prior to the accident, Mr. Stapleton saw Carl Simpson enter into the B-2 Sutter machine to knock-out a sticker. (*Id.*; Kelley, p. 15). Next, Mr. Stapleton saw Jamie Brammer ask Carl Simpson for Brammer's keys while Carl was still leaning into the machine. (Stapleton, p. 31). Paul Kelley also heard Brammer request his keys and say to Carl "I'm going to the side". (Kelley Affidavit, Paragraph 13, attached as "Exhibit 2"). Carl Simpson removed himself from the machine, reached and got the keys, handed them to Jamie Brammer, then went back into the machine to finish removing the sticker. (Stapleton, p. 31).

After this, Mr. Stapleton heard Carl Simpson's machine stripping upward and remembered thinking Carl Simpson had gotten the sticker out fast. (*Id.*, pp. 31-32). Mr. Stapleton heard the B-2 Sutter machine make a clicking noise and turned around to look, only to find that Mr. Simpson had been crushed in the machine's pinchpoint. (*Id.*, p. 32). At that point, Thomas Stapleton yelled at Jamie Brammer and told him to release the machine. Jamie Brammer was in the process of coming back around the Sutter machine to the operator's station. (*Id.*, pp. 32-33). Thomas Stapleton was sure Mr. Simpson went right back into the Sutter machine after handing Brammer's keys to him because Simpson was <u>not</u> finished removing the sticker he had been working on when Jamie Brammer asked for his keys. (*Id.*, pp. 33, 57).

Stickers that developed in the Sutter machines were removed with a hammer and chisel. Mr. Stapleton further

noticed that when Jamie Brammer asked for his keys, Carl Simpson left his hammer and chisel inside the Sutter machine. Upon handing Jamie Brammer his keys, Mr. Stapleton saw Carl Simpson re-enter the machine where he had left his hammer and chisel. (*Id.*, p. 57). The act of leaving the hammer and chisel inside the Sutter machine was a further indication that Mr. Simpson was not finished removing the sticker. (*Id.* p.58).



The photograph above and attached as "Exhibit 3" reflects that Mr. Simpson's hammer and chisel remained in the Sutter machine after he was taken to the emergency room. This photograph demonstrates one of the many inconsistencies with Jamie Brammer's version of the incident. (Brammer, p. 58). [Photograph provided by Intermet to Plaintiff in discovery]. The last time Mr. Stapleton saw Jamie Brammer was when he

walked around the backside of the Sutter machine to the manual hydraulic valve, a place where it is impossible to see what Mr. Simpson was doing or if he was safely positioned to allow the reactivation of the B-2 Sutter. (Stapleton, pp. 57, 69).

When the operator or helper was completely finished removing a sticker from the cope, the operator would have to activate a solenoid/hydraulic value on the back side of the Sutter machine. (*Id.*, p. 69). The activation of the valve raises the cope up to meet the gas head. (Brammer, p. 48). The visibility from the backside of the Sutter machines where the hydraulic/solenoid value was located to the area where the helper would be located has been described as a zero line of visibility. (Stapleton, p. 69; *See also:* Supervisor Wilburn, pp. 69, 100; Brammer, p. 46; Supervisor Mullins, p. 37).

**C.     *Knowledge of Defendant, Intermet***

Intermet management knew that the location of the hydraulic/solenoid valve for the Sutter machines created a dangerous condition within Intermet's business operation. (Supervisor Wilburn, pp. 34-35; Safety Committee Member Ted Lambert, pp. 77-78; Vice President Allread, pp. 95-96; Kelley, pp. 36, 55-6). Further, Intermet had the capabilities of putting the hydraulic valve in any location it chose. (Vice President Allread, p. 93; Supervisor Ramey, p. 56). Ted Lambert, a union member of Intermet's safety committee, made efforts prior to Simpson's death to have the hydraulic/solenoid valve moved to a location where the operator could easily see his helper when raising the cope

back to the gas head. (Lambert, p. 85). Ted Lambert had informed the plant safety supervisor, Bill Perdue, of the dangerous condition. (Lambert, p. 85). Paul Kelley would regularly complain to his foremen that if additional safety measures were not taken "somebody's going to get killed" on the Sutter machines. (Kelley, p. 36). Yet, Intermet took no action to correct the existence of the dangerous condition within Intermet's business operations until after Carl Simpson was killed. (Supervisor Wilburn, p. 37; Kelley, pp. 32-34; Lambert, p. 75).

### D.      Lockout/Tagout (LOTO) Procedure

Intermet contends that had Carl Simpson followed the LOTO procedure, then his death would not have occurred. In Intermet's Motion for Summary Judgment, the Defendant sets forth statements from employees regarding the fact that a written LOTO procedure existed and employees were trained regarding LOTO.

Intermet had no safety training in place, which specifically dealt with the operation of the Sutter machines. (Supervisor Wilburn, pp. 14-15). What little LOTO training was provided by Intermet was with reference to general LOTO procedures only, rather than training directed to the Sutter machines. (Id., pp. 14-15; Lambert; p. 13; Kelley, pp. 9-10; Ramey, pp. 7, 12-13). This "safety training" that Intermet provided consisted of the foreman playing a 20-minute video for the employees. Only occasionally did the video involve LOTO issues. (Id.; Lambert, p. 12). The written policy presented to employees and the rudimentary training that was

presented to employees gave them only a basic understanding of general LOTO procedures. However, the day-to-day operations and procedures to be followed by employees regarding LOTO and removal of stickers from the Sutter machines was quite different. (Lambert, p. 29).

Employees who operated the Sutter machines entered the machine frequently to clean stickers without full LOTO procedures in place, which was commonly known by Interment management. (Supervisor Wilburn, pp. 39-40; Lambert, pp. 25, 28-29, 31; Cole, p. 57; Stevens, pp. 11, 13; Supervisor Ramey, p. 30).

Members of Intermet management regularly entered the Sutter machines to remove stickers without proper LOTO. Management made no effort to correct or discipline employees that entered the Sutter pinchpoints without proper LOTO. (Supervisor Wilburn, p. 65; Supervisor Ramey, pp. 30, 32-34, 69, 82, 117; Stapleton, pp. 26-27, 65-66; Lambert, pp. 50, 58).

Management personnel refused to enforce the proper LOTO procedure in order to avoid delays and increase production. Two to three months prior to the death of Carl Simpson, a Sutter machine operator was transferred to a different job for his refusal to shortcut the safety procedures regarding LOTO and removal of stickers. (Lambert, p. 81). These shortcuts, however, significantly increased the risk of harm to Intermet employees. (Stapleton, pp. 15-16; Lambert, pp. 20-22, 25, 52, 58; Wilburn, pp. 40-41; Stevens, p. 13; Cole, p. 57). The union members of the plant safety committee expressed their concern over the stressing of

productivity over safety, yet no action was ever taken by management in response to those concerns. (Lambert, pp. 51-52).

A proper LOTO procedure would have required both the helper and operator to place their individual locks upon all three power sources during the LOTO and Intermet's policy failed to set forth such a requirement. (Jones, pp. 26-29). Further, Intermet employees were frequently not provided with necessary locks to carry out a proper LOTO procedure. (Supervisor Wilburn, p. 95; Stevens, pp. 10-11; Kelley, pp. 10-11).

### E.    *Prior Injuries*

Prior to Carl Simpson's death, there were numerous incidents of similar injuries or near injuries at Intermet's Ironton foundry due to employees' exposure to pinchpoints.

On February 19, 1998, Grady Runyon was performing the identical task that Carl Simpson was performing when Simpson was killed. While Mr. Runyon was removing a sticker from the top of the cope on the Sutter machine, the gas head collapsed, crushing his hands. (Bureau of Workers' Compensation Report of Injury, "Exhibit 4"; document received in discovery responses from Defendant Intermet, Bates Number: 2270 and 2278. Ramey, pp. 29-31; Brammer, p. 10). Though Intermet did take action to add safety bars to prevent the gas head from falling, the safety bars as installed did not prevent the cope from rising up to meet the gas head. The safety bars would not prevent an individual who was removing stickers from being

crushed between the gas head and the cope. (Supervisor Ramey, pp. 51-52; Supervisor Wilburn, p. 29).

Sometime around 1995, Tom Slaughter, an operator on the Sutter machine, lost the end of his finger when he attempted to clean the end of a blow tube between the cope and drag without the machine being in a LOTO mode. (Stapleton, pp. 34-36; Ramey, pp. 19-20).

On November 21, 1995, while operating a core machine at Ironton Iron, an employee reached into the machine to wipe out a piece of sand and his hand and wrist were crushed. The core machine was similar to the Sutter machines on a smaller scale. (Supervisor Wilburn, p. 38). As a result of this injury, there was a citation issued by the Occupational Health and Safety Administration (OSHA) for the failure to guard employees from pinchpoints. (U.S. Department of Labor/OSHA citation and worksheets, attached hereto and marked as "Exhibit 5").

A near injury involved Gerald Wilburn, a supervisor, while he was cleaning stickers from the Sutter machine with his hands in the machine, someone hit the hydraulic valve on the backside of the machine causing the machine to come together. The hammer Mr. Wilburn was using was thick enough to hold the parts of the machine far enough apart to keep his hands from being crushed. If it had not been for the hammer being in the machine, he would have lost his fingers. (Supervisor Wilburn, p. 36).

There was a near fatal accident on the Sutter machine prior to the death of Carl Simpson. Adam Ainsworth was operating the machine with his helper, Jim Noble. During the

removal of a sticker, Jim Noble reentered the machine while Ainsworth was activating the machine.  Fortunately for Noble, Ainsworth was able to stop the machine before crushing Noble. This incident was known throughout the plant as a "near fatality" in the Sutter machine.  (Supervisor Wilburn, pp. 22-23, 29).  No action was taken by Intermet following this near fatality to change or enforce safety procedures, to create safeguards regarding the pinchpoints on the Sutter machines, or to move the solenoid valve from the opposite side of the machine from where Noble entered the machine.  (Ramey, pp. 24-28; Safety meeting notes as supplied by Defendants to Plaintiffs in discovery, attached hereto and marked as "Exhibit 6", *highlight added*).

**F.    *Additional Safety Devices Never Incorporated***

From the time the Sutter machines were placed in the Ironton Intermet foundry in 1992 until the death of Carl Simpson in 1999, no operational safety devices were placed on the Sutter machine to protect employees from unguarded pinchpoints created by the operation or maintenance of the Sutter machines.  (Kelley Affidavit, Paragraphs 8 and 9, "Exhibit 2"; Stapleton Affidavit, Paragraphs 6 through 9, attached hereto and marked as "Exhibit 7"; Ted Lambert Affidavit, Paragraphs 7 through 9, attached hereto and marked as "Exhibit 8").

During the installation of the Sutter machines at the Ironton Intermet plant in 1992, correspondence between Intermet and Defendant CMI-Equipment & Engineering, Inc. (hereinafter referred to as "CMI") demonstrate there was at

least some concern that the accidental closing of the Sutter machines during cleaning or other maintenance operations would result in injury. (See Discovery Document Bates Numbered: HL40-41, 41-1, and 41-2 attached hereto and marked as "Exhibit 9", highlights not in original). This correspondence from CMI to Intermet discussed the possibility of incorporating a swing stop. (See paragraph 3 of "Exhibit 9"). Such a swing stop would be mounted to the Sutter machine columns and would be manually positioned to prevent employee injuries. Unfortunately, this safety swing stop was never installed on the Sutter machines at Intermet. (Supervisor Mullins, pp. 58-59).

Another more inexpensive option to the swing stop, which was recommended by Defendant CMI, would have been the incorporation or the required use of die blocks. Die blocks could be inserted into a pinchpoint while the machine was being serviced by the employees to prevent crush injuries. Yet, use of die blocks was not mandated by Intermet and only used occasionally by operators based upon individual initiative. (Stapleton, pp. 66-68, 78-79; Lambert, p. 65; Stevens, p. 29; Kelley, p. 64).

Light curtains and/or light beams, similar to those seen on every automatic garage door opener, would have also been another viable safety precaution for the Sutter machines. While Intermet made an attempt to put light curtains on the Sutter machines for safety purposes, such attempts lasted only a day or two and were immediately disconnected as they slowed production. (Supervisor Wilburn, p. 28; Supervisor Ramey, pp.

41-42; Stapleton, pp. 40-41; Lambert, pp.47-48). Light curtains or light beams are generally connected to the machine's control panel to either ensure guards are in place prior to creating a pinchpoint, or in the alternative, such devices immediately disable a machine if someone or something enters the area of the point of operation. (Maul, pp. 58-59).

Finally, Intermet's Vice President, John Allread, was aware that OSHA required guards to protect the operator and helper of the Sutter machines. (Allread, pp. 76-77). Yet, at no time prior to Mr. Simpson's incident were the Sutter machines at Intermet equipped with guards/gates to protect the employees. (Wilburn, pp. 33-34; Lambert, p. 41).



Photograph provided to plaintiffs by defendants and was referred to in discovery depositions as J 000003. Above and attached as "Exhibit 10".

"Exhibit 10" is a photograph taken minutes after Simpson was crushed, reflecting the Sutter machine was not equipped with guards on September 21, 1999. This photograph is taken from a viewpoint behind the location where Mr. Simpson was working as a helper.



Photograph provided to plaintiffs by defendants. Attached hereto and marked as "Exhibit 11".

"Exhibit 11" as set forth above demonstrates that, following Mr. Simpson's death, guards incorporating the use of a light beam were placed on the Sutter machines. These guards protected the employees from the point of operation of the Sutter machines. "Exhibit 11" is being set forth to demonstrate and eliminate any argument by Intermet that it was not feasible or an otherwise acceptable alternative to provide a safe work environment for the employees.

**G.**        ***OSHA Citation Resulting from Simpson's Death***

Attached hereto and marked as "Exhibit 12" are the OSHA Citations, Notification of Penalties, Stipulations and Settlement Agreements entered into between the Secretary of Labor/OSHA and Defendant Intermet.[2]   These citations outline the concerns and the facts as demonstrated to this point in the Memorandum related to the unsafe working environment at Intermet.   The OSHA worksheets[3] indicate that an inspection was conducted on September 22 and September 23, 1999, two days following Carl Simpson's death.   (See "Exhibit 13").   These worksheets reflect many of the facts that have been set forth herein by both foremen and employees of Intermet.   These citations include, but are not limited to, violations of proper machine specific lockout procedures for the B-2 Sutter machine, which did not include the necessary steps to be taken to return the machine back into operation following lockout application.   (*See* "*Exhibit 13", Citation 1, Item 2).* Citation 1, Item 4 also alleges that the affected employees such as "helpers" for the B-1 and B-2 Sutter machines were not trained in the purpose and use of energy control procedures. This citation also coincides with many of the facts as

---

[2] OSHA documents are admissible to prove elements related to the proximate cause of the injury.  Evidence of an employer's OSHA violations cannot be excluded from a fact finder's consideration of proximate cause and whether an employee's omissions completely eliminated  the effect of any defect in the machine.  Mark v. Mellott Manufacturing Co., Inc. (1995) 106 Ohio App. 3d 571; 666 N.E. 2d 631.  *Cert. denied.*  Mark v. Mellott Manufacturing Co., Inc. (1996) 75 Ohio St.3d 1411; 661 N.E. 2d 759.  Paragraphs of settlement agreement are not binding on Plaintiff, as they were not a party in that proceeding.

[2] The information as contained in the OSHA worksheets were obtained pursuant to the Freedom of Information Act and request of undersigned counsel.  An Affidavit referring to the authentication is attached to and incorporated to the worksheet exhibit.  Additional authentication, if required by Defendant, will be obtained for admissibility at trial.

[3] The information as contained in the OSHA worksheets were obtained pursuant to the Freedom of Information Act and request of undersigned counsel.  An Affidavit referring to the authentication is attached to and incorporated to the worksheet exhibit.  Additional authentication, if required by Defendant, will be obtained for admissibility at trial.

demonstrated above as it relates to the failure to properly and adequately train the operators and helpers of the B-2 Sutter machine. (Id.)

Citation 1, Item 6 demonstrates that on the date of Carl Simpson's death, methods were not in place to ensure that all employees were safely positioned or removed from the work area before the energy was restored to the B-2 Sutter machine. That worksheet states in the "employer knowledge" section that all employees and supervisors observed the method of operation daily, which failed to comply with requirement. Citation 1, Item 7 sets forth that the pinchpoints created by the movement of the Sutter cope, drag and gas head were not guarded or otherwise protected from contact by employees operating the B-2 Sutter machine. (Id.)

Additionally, the citation worksheet dealing with the stored or residual error in hydraulic energy cites the fact that the employer had knowledge of such defect because Intermet had received prior citations dealing with the failure to properly lock and tag-out. In the "employer knowledge" section, OSHA states Intermet's LOTO program did not adequately cover issues such as stored energy.

The most significant citation, being Citation 2, Item 1, was a willful violation for failure to put safeguards in place on the B-2 Sutter machines to prevent employee access to the point of operation during the machine's cycles.

The worksheet as contained in "Exhibit 13" relating to the willful violation notes there was no point of operation protection. Further, the worksheet indicates that the

operator and helper get "within a few inches during the closing portion of the cycle to flip up the finished sand mold." The worksheet goes on to indicate that 950-1000 pounds per square inch of hydraulic pressure was used. Also, the worksheet confirms statements by supervisors and employees that light curtains were installed one to two years ago and were removed. Line 23 of the worksheet indicates that the employer's knowledge was imputed based on the attempts to install the light curtains and the subsequent removal of those light curtains. Intermet's knowledge was also imputed based on the fact they were also was cited in March, 1996, for a similar violation, to which OSHA imputed prior knowledge to Intermet of the dangerous situation. (Id.)

**III.    ARGUMENT**

**A.    *Standard of Review***

Summary Judgment is only appropriate when there are no issues of material fact and the moving party is entitled to Judgment of the matter of law. (See Fed. R. Civ. Pro. 56 (C)). In deciding a Motion for Summary Judgment, the court must view the evidence and draw all reasonable inferences in favor the non-moving party. See <u>Matsushita Elec. Indus. Co. v., Zenith Radio Corp.</u>, 475 US 574, 587, 106 St. 1348 (1986). The judge is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial". <u>Anderson v. Liberty Lobby, Inc.</u>, 477 US 242, 249, 106 S. Ct. 2505 (1986). A genuine issue for trial is presented when there is sufficient "evidence on which the jury could reasonably find for the [non-moving party]". (*Id.,* at 252).

**B.      *Ohio's Intentional Tort Law***

The parties herein agree that Fyffe v. Jeno's, Inc. 59 Ohio St. 3d 115, 570 N.E. 2d 1108 (1991) is the controlling law for this case.  Fyffe requires the plaintiff to present evidence that (1) the defendant had knowledge of the existence of a dangerous condition, process, procedure, or instrumentality, (2) the employer knew with substantial certainty that the employee was likely to suffer harm, and (3) the employer required the employee to perform the job despite its knowledge of the danger.  (*Id.*)[4]  For the purposes of intentional tort liability, and employer's failure to comply with safety regulations is a relevant consideration in determining the employer's knowledge of a substantial certainty of injury.  Anderson v. Zavarella Bros. Constr. Co. (Dec. 5, 1996) Cuyahoga App. No 70657, at 5, 1996 Ohio App. LEXIS 5468. (Attached hereto and marked as "Exhibit 14") Proof to establish the three elements necessary for the intentional tort may be made by direct and or indirect circumstantial evidence.  Hannah v. Dayton Power Light Co. 82 Ohio St.3d 696 N.E.2d  1044(1998).  The three prongs of Fyffe are questions of fact.  Maples v. Columbus Zoological Park Assoc., 91 Ohio App.3d 133, 631 N.E. 2d 1105*(1993)*.

For an analysis of facts that are similar to those before the Court, Plaintiffs ask the Court to review Logan v. Birmingham Steel Corp. Sept. 25, 2003 Ohio 5065; 2003 Ohio App. LEXIS 4591, (attached hereto and marked as "Exhibit 15"). In Birmingham Steel, the trial court erroneously granted

Summary Judgment to the employer on a fact situation very similar to those *sub judice*. In addition to those facts the and law discussed in <u>Birmingham Steel</u>, the Plaintiffs would also direct the Court's attention to the numerous previous accidents as well as the near fatal accidents on the B-2 Sutter machines at Intermet. This, in addition to the fact that Intermet took no steps to implement safety guards or other measures to protect the employees from the Sutter machines' pinchpoints, demonstrates a stronger case than discussed in <u>Birmingham Steel</u>. After a review of the facts discussed in <u>Birmingham Steel</u>, the appellate court appreciated that reasonable minds could have concluded that: (1) the employer was aware of employees not locking out dangerous machinery before removing cobbles; (2) the activity was dangerous for which the risk of injury was substantially likely to occur; and (3) the employees were required to complete the task. Based on the thorough discussion of the facts as set forth previously in this Memorandum, the plaintiffs believe there exists a plethora of evidence that would support the Court's denial of Intermet's Motion for Summary Judgment.

### 1.  <u>Intermet's Knowledge of a Dangerous Condition.</u>

Intermet's Motion for Summary Judgment basically ignores the first requirement set forth by *Fyffe*. Obviously Intermet concedes the fact that the removal of stickers in the B-2 Sutter machine is a dangerous process, as acknowledged by supervisors and Intermet's Vice President. (Supervisor Wilburn pp. 34-35; Vice President Allread pp. 95-96.)

---

[4] Plaintiffs concede that Plaintiff's Second Cause of Action against Intermet was based, in part, on R.C. § 2745.01, which has since been declared unconstitutional. However, Plaintiff's complaint has adequately plead and placed

Several Intermet employees regularly made complaints about the dangerous conditions regarding the Sutter machines to their supervisors. (Kelly at pp. 36; Lambert pp. 85; James Brammer Affidavit paragraph 5, attached hereto and marked at "Exhibit 16"). The numerous injuries and near serious injuries on the Sutter machines as discussed on pp. 8-10 of the facts set forth herein also clearly demonstrate Intermet was aware of the dangerous conditions within its business operation.

**2.    Substantial Certainty of Harm.**

Intermet asserts on page 9 of their Memorandum in Support that there have not been similar injuries on the Sutter machines. This assertion is completely misguided. The prior injuries and near injuries that were discussed on pp. 8-10 of Plaintiff's Memorandum clearly demonstrates that Intermet had both knowledge of the dangerous process as well as knowledge of the substantial certainty of harm to its employees. Yet, at no time prior to Mr. Simpson's injury did Intermet take adequate steps to protect their employees from the pinchpoints created in the Sutter machines. (Affidavit Tom Stapleton paragraphs 6-9, Exhibit 7; Affidavit of Andrea Yates paragraph 5, attached hereto and marked as "Exhibit 17"; Affidavit of Angela Cole paragraph 2, attached hereto and marked as "Exhibit 18"; Affidavit of Paul Kelley paragraphs 8-9, Exhibit 2; Affidavit Brammer paragraphs 7-11)

Ohio law is clear; simply because people are not injured, maimed, or killed every time they encounter a devise or procedure is not solely determinative of the question of whether that procedure or devise is dangerous and unsafe. It

is not incumbent that a person be burned before one knows how to play with fire. <u>Cook v. Cleveland Elec. Illuminating Co.</u>, 102 Ohio App.3d 417, 429-430 657 N.E. 2d 356 (1995); *See also*, <u>Taulbee v. Adience, Inc. BMI Div.</u>, 120 Ohio App.3d 11, 696 N.E.2d 625 (1997).

Removing stickers is considered to be an operations task, done by the operators and helpers of the Sutter machine while in production.  These stickers occur with relative frequency.  (See Brammer pp. 39; Supervisor Wilburn pp. 39-40; Lambert pp. 25, 28-29, 31; Cole pp. 57; Supervisor Ramey pp. 30)  The fact that Intermet management and employees would often enter in the Sutter machine's pinch points without proper LOTO significantly increased the danger to which Carl Simpson was exposed.  (See factual citations set forth on pages 7-8 of Plaintiff's Memorandum.)  Members of management refused to enforce a proper LOTO procedure to increase production. (*Id.*) In fact, Ted Lambert was removed from the Sutter machines when he attempted to properly LOTO the Sutter machines prior to the cleaning procedures.  Based on this procedure, his production was not good enough for the department head and as a result, he was removed as a Sutter operator. (See Lambert p. 18).  In fact, Supervisor Scott Miller told Ted Lambert not to lock the Sutter machines out and that certain sticker removals did not require LOTO.  (See Lambert p. 21).  The employer has acknowledged the process of sticker removal is dangerous.

The fact that employees were required to remove stickers, which occurred frequently, in an unsafe manner clearly created the substantial certainty that harm would

occur. Engineering expert, Gary Maul, Ph.D., described the situation when an employee would activate the machine when he had no line of sight to his helper as flying blind. This, in conjunction with a machine that had no guarding to protect the helper from the pinchpoint, created a situation where the potential for disaster was a near certainty. (Maul, p. 120; OSHA expert Jones, p. 97).

These facts, when coupled with the fact that Intermet was primarily concerned with production rather than employee safety, would result in reasonable minds finding that Intermet failed to enforce a LOTO procedure in order to avoid delays and increase production while increasing the risk of known harm to Carl Simpson.

Intermet's reliance on <u>Jandro v. Ohio Eddison Co.</u>, 167 Fed.3d 309 (6th Cir. 1999) with the facts as set forth herein is entirely misplaced. <u>Jandro</u> and the other case law as set forth on pages 10-11 of Intermet's Memorandum in Support of their Motion, can be easily distinguished by the fact that Intermet failed to take reasonable steps to protect their employees operating the Sutter machines. Further, the facts herein demonstrate more than an employer's failure to adopt or implement an effective safety program. The facts herein demonstrate that Intermet, while having a written LOTO procedure actually required their employees to skip safety procedures in an effort to increase production. Attempting to shift blame to Carl Simpson for failing to follow a proper LOTO procedure in light of the facts discussed herein is inexcusable. Simpson, unfortunately, at the time of his death was performing a dangerous task in the manner he was trained

and required to do purely to increase production for Intermet.

One reason Intermet management may have neglected to enforce proper LOTO was the fact that even while locked out, the Sutter machines as installed and maintained by Intermet were not rendered to a zero energy state as required by OSHA. (See Kelley p.61; Brammer pp. 11-12,60; OSHA citations discussed herein pp 15-16; OSHA expert Jones, p. 37).

As a result, even with proper LOTO, the Sutter machines as maintained by Intermet were not rendered to a zero energy state and injury to employees at Intermet who were required to enter into the Sutter machines was a substantial certainty.

### 3.   **Required Performance of Dangerous Duties.**

The facts as demonstrated by Tom Stapleton and Paul Kelley, the two individuals in the nearest proximity to Mr. Simpson at the time of his death, both demonstrate that he was in the middle of the process of removing a sticker at the time of his death.   Further, the facts as discussed herein clearly demonstrate that Intermet, required employees to enter pinchpoints of the Sutter machines without proper LOTO.   In fact, Ted Lambert testified that he had been instructed by supervisors to enter the machine without proper LOTO.   Yet Intermet refused to incorporate measures to eliminate residual energy, require use of die blocks or other safety devices to eliminate the risk to their employees, or relocate the hydraulic valve to a location so the operator could see his helper.

The removal of stickers was part of the duties of the

operators and helpers on the Sutter machines. The operators and helpers were required to remove the stickers as part of their job. (Supervisor Perdue, p. 118; Supervisor Arthur, p. 27). Carl Simpson had to enter his upper body into the machine between the gas head and cope, being an area of about 18", in order to remove the sticker. Thus, Carl Simpson was required, as part of his job, to perform the dangerous task of removing the sticker. (Stapleton, p. 18; Maul, p. 55).

**C.    *Bonnie Reed Simpson's Loss of Consortium.***

Bonnie Reed Simpson has set forth facts, when viewed in a light most favorable to the Plaintiffs, that would allow her to prevail on her loss of consortium claim. As such, the Plaintiffs would request that this Court deny Defendant Intermet's Motion for Summary Judgment on Bonnie Reed Simpson's loss of consortium claim.

**1.    <u>The loss of consortium claim is not barred by the Ohio Workers' Compensation Act.</u>**

As previously discussed in the Plaintiffs' Memorandum in Opposition, the Ohio Workers' Compensation Act does not bar a worker from bringing suit against an employer when it can be shown that the employer committed an intentional tort causing injury to the employee. Similarly, the Ohio Workers' Compensation Act does not bar the wife of an injured employee from bringing a claim for loss of consortium when her spouse was intentionally injured by his employer. Because Intermet intentionally caused the death of Carl Simpson, his wife,

Bonnie Reed Simpson, is entitled to bring her loss of consortium claim, as this claim falls outside the purview of the Ohio Workers' Compensation Act.


### 2. Carl Simpson's Death was not instantaneous.

Defendant Intermet, in its' Memorandum in Support, asserts that a wife does not have an independent cause of action for loss of consortium against the person who caused her husband's instantaneous death. The case law Intermet relies upon, however, is not applicable to the case at bar. The holding Defendant Intermet relies upon is applicable to cases where the decedent's death is instantaneous.

In the case presently before the Court, Carl Simpson's death was not instantaneous. (See Carl Simpson's death certificate attached hereto as "Exhibit 19"). In fact, Carl Simpson survived for some three (3) hours following his injuries. (*Id.*). This important factual distinction results in the case at bar not falling under the holding cited by the Defendant Intermet. As such, summary judgment is inappropriate.


### 3. Bonnie Reed Simpson was Carl Simpson's wife.

The Plaintiffs concede, in order to have a valid loss of consortium claim, a valid marriage relationship must have existed. In the instant case, factual issues are present that would allow a reasonable juror could conclude a common law marriage[5] existed between Bonnie Reed Simpson and Carl Simpson.

Defendant Intermet, in an attempt to bolster its

assertion that Carl Simpson and Bonnie Reed Simpson were not married, lists some instances of conduct that appear to indicate Carl Simpson did not consider himself married.  The greater weight of the evidence indicates that Carl Simpson did indeed consider himself to be the spouse of Bonnie Reed Simpson.  Thomas Stapleton, a co-worker of Carl Simpson, has stated that Carl Simpson told him he was married to Bonnie Reed Simpson.  (Stapleton, p. 75).   In addition, Carl Simpson's reputation in the community was that he was, in fact, married.  (Stapleton, pp. 70-71; Stevens, pp. 30-31; Cole, p. 55).

Bonnie Reed Simpson has also indicated that she and Carl Simpson held themselves out to be a married couple.  (Bonnie Reed Simpson, pp. 21-24).  The two of them even told many members of the community that they were married.  (*Id.*).

All of these facts have been previously considered by the Lawrence County Probate Court.  That Court found that sufficient proof existed to prove that Carl Simpson and Bonnie Reed Simpson were married.  (See Judgment Entry of the Lawrence County Probate Court attached hereto as "Exhibit 21").  The Lawrence County Probate Court also considered additional facts to conclude Carl Simpson and Bonnie Reed Simpson held themselves out to the community as husband and wife.  Among these facts are the existence of a joint and survivorship savings account at the Ironton DMI Employees Federal Credit Union, numerous school records reflecting that Bonnie Reed Simpson was recognized as a parent of Carl Simpson's children, and statements by independent third

---

[5] The Ohio legislature abolished common law marriage October, 1991, pursuant to R.C. § 3105.12.  However, common law marriages that occurred in the State of Ohio prior to the effective date of this statute were not

parties indicating that they believed Carl Simpson and Bonnie Reed Simpson held themselves out as a married couple. (See Petition for Determination of Heirship attached hereto as "Exhibit 22").

After considering all of these facts, one court has already determined that a valid common law marriage between Carl Simpson and Bonnie Reed Simpson existed. This determination demonstrates that there are, at the very least, questions of fact as to whether sufficient evidence exists to establish a common law marriage. Because these questions of fact exist, summary judgment is inappropriate. Thus, the Plaintiffs would request that this Court deny Defendant Intermet's Motion for Summary Judgment regarding Bonnie Reed Simpson's loss of consortium claim.

**IV.    CONCLUSION**

Defendant Intermet has attempted to put blame upon Carl Simpson for his death. There exists conflicting testimony from Jamie Brammer, the operator of the B-2 Sutter machine, and those individuals nearest to Carl Simpson at the time of his injury. The facts as set forth herein, as well as the discussion of the controlling law, demonstrate there is a genuine issue for trial.

Though the Plaintiffs believe, given the undisputed facts that Defendant Intermet clearly committed an intentional tort, at the very least questions of fact exist as to whether Defendant Intermet committed an intentional tort. The existence of these disputed material facts, as such, require that Defendant Intermet's Motion be denied.

LAMBERT, McWHORTER & BOWLING

 /s/ Randall L. Lambert
RANDALL L. LAMBERT (0017987)
D. SCOTT BOWLING (0067617)
COUNSEL FOR PLAINTIFFS
215 SOUTH 4TH STREET
P. O. BOX 725
IRONTON, OH  45638
(740) 532-4333

### *CERTIFICATE OF SERVICE*

I hereby certify that a true copy of the foregoing Memorandum in Opposition to Defendant Intermet's Motion for Summary Judgment was served by electronic filing and U. S. regular mail on this the ____ 27th day of May, 2004, upon the following:

Lawrence J. Barty, Esquire        Mark T. Hayden, Esquire
Patricia Anderson Pryor, Esquire  Nancy J. Bride, Esquire
188 First Tower                   2800 Chemed Center
4525 Walnut Street                255 East Fifth Street
Cincinnati, OH  45202-3957        Cincinnati, OH  45202
Counsel for Defendant, Intermet   Counsel for Defendant,
Corporation and Ironton Iron      Hayes-Lemmerz

LAMBERT, McWHORTER & BOWLING

 /s/ Randall L. Lambert
RANDALL L. LAMBERT (0017987)
D. SCOTT BOWLING (0067617)
COUNSEL FOR PLAINTIFFS