IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


CARL G. SIMPSON AND BONNIE REED
SIMPSON, CO-ADMINISTRATORS OF                    CASE NO.:  C-1-00014
THE ESTATE OF CARL D. SIMPSON

        PLAINTIFFS                                        JUDGE J. DLOTT

VS.

INTERMET CORPORATION, ET AL.

        DEFENDANTS

_____

*PLAINTIFFS' MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY*
*JUDGMENT OF DEFENDANT, CMI*


Now come Plaintiffs, by and through counsel, setting forth their Memorandum in Opposition to the Motion for Summary Judgment filed on behalf of Defendant, Hayes-Lemmerz International – Equipment & Engineering, Inc., d/b/a: CMI – Equipment & Engineering, Inc. (hereinafter referred to as "CMI"), responding that:


**I.    INTRODUCTION**

Carl D. Simpson ("Simpson") was employed by Intermet at its Ironton, Ohio foundry.  On September 21, 1999, Mr. Simpson was fatally crushed in the B-2 Sutter machine.  The Sutter machine involved in Mr. Simpson's death was re-manufactured by Defendant CMI.  CMI re-manufactured the machine for co-Defendant Intermet in 1992.  Plaintiffs have also brought an intentional tort claim against Carl Simpson's employer, co-Defendant Intermet Corporation.

The facts as more fully set forth herein will

demonstrate the B-2 Sutter machine was defective as manufactured by CMI. The facts will further demonstrate that the B-2 Sutter machine as re-manufactured by CMI failed to comply with federal regulations and the American National Standard Safety Requirements (hereinafter referred to as "ANSI Standards"). These facts as more fully set forth herein will demonstrate that there are genuine issues of material fact proper for trial.

## II.    STATEMENT OF FACTS

### A.    *General Background*

In 1992, CMI sold to Intermet a coring machine (1630 Sutter machine aka: B-2 Sutter) that is at issue in this case. CMI designed and manufactured the Sutter machine (Gould, pp. 27-28).[1] The brief description of the Sutter machine/coring machine as set forth in CMI's Memorandum in Support of their Motion for Summary Judgment on page 3 is fairly accurate and generally describes the machine at issue. The Sutter machine has three (3) internal components, being the gas head, cope, and drag. The Sutter machine, as used at Ironton Iron is a two-man operation, due to the size of the mild. The two men who ran the machine at Intermet were referred to as the operator and the helper. During the operation of a Sutter machine, the internal components come together with such force that a person inside the machine when it is running will be crushed by these parts. (Brammer, p.

---

[1] Relevant portions of the transcripts are set forth and marked herein as "Exhibit 1". Deposition transcripts set forth the name of the deponent and relevant pages.

95).

For the purposes of this Memorandum, the Plaintiffs concede that Defendant CMI may well have complied with the various warning requirements when they sold the Sutter machine to Intermet. Further, the Plaintiffs will concede, for the purpose of summary judgment, that CMI warned that proper lockout/tagout (hereinafter referred to as "LOTO") procedures should be followed by the Sutter machine operators.

However, the Sutter machine supplied to Intermet was defective as manufactured by CMI. This defect primarily consists of the failure to install guards preventing employee access to the pinchpoints created during the operation of the Sutter machine. The Sutter machine as supplied by CMI was unsafe due to its lack of guarding in violation of CFR 1910.217. (Maul, pp. 52-53). This section of the Federal Regulations applies to manufacturers. (*Id*.). With adequate guarding, Carl Simpson's death on September 21, 1999, would have been prevented. (Maul, p. 73).

At the time of Carl Simpson's death, the Sutter machine as re-manufactured by CMI had no guarding. (Maul, p. 74; Wilburn, pp. 33-34; Lambert, p. 41). Set forth below and marked as "Exhibit 2" is a photograph taken moments after Carl Simpson was crushed.



Photograph provided to plaintiffs by defendants and was referred to in discovery depositions as J 000003. Above and attached as "Exhibit 2".

This photograph demonstrates the pinchpoint that was created between the cope and the gas head.

**B.    *Carl Simpson's Injury***

On September 21, 1999, Carl Simpson was working in this area removing clogged sand, which the Intermet employees referred to as "stickers". (Stapleton, p. 30; Kelley, p. 15). Thomas Stapleton was the operator of the B-1 Sutter machine located adjacent to the B-2 Sutter machine. (Stapleton, p. 29). Mr. Stapleton's helper on the date of the accident was Paul Kelley. (Stapleton, p. 30).

Immediately prior to the accident, Mr. Stapleton saw Carl Simpson enter into the B-2 Sutter machine to knock-out a sticker. (*Id.*; Kelley, p. 15). Next, Mr. Stapleton saw Jamie

Brammer ask Carl Simpson for his keys while Carl was still leaning into the machine. (Stapleton, p. 31). Paul Kelley also heard Brammer request his keys and say to Carl "I'm going to the side". (Kelley Affidavit, Paragraph 13, attached as "Exhibit 3"). Carl Simpson removed himself from the machine, reached and got the keys, handed them to Jamie Brammer, then went back into the machine to finish removing the sticker. (Stapleton, p. 31).

After this, Mr. Stapleton heard Carl Simpson's machine stripping upward and remembered thinking Carl Simpson had gotten the sticker out fast. (*Id.*, pp. 31-32). Mr. Stapleton heard the B-2 Sutter machine make a clicking noise and turned around to look, only to find that Mr. Simpson had been crushed in the machine's pinchpoint. (*Id.*, p. 32). At that point, Thomas Stapleton yelled at Jamie Brammer and told him to release the machine. Jamie Brammer was in the process of coming back around the Sutter machine to the operator's station. (*Id.*, pp. 32-33). When Simpson was crushed inside the B-2 Sutter machine, Thomas Stapleton was sure Mr. Simpson went right back into the Sutter machine after handing Brammer's keys to him because Simpson was <u>not</u> finished removing the sticker he had been working on when Jamie Brammer asked for his keys. (*Id.*, pp. 33, 57).

**III.    ARGUMENT**

**A.    *Summary Judgment Standard***

Summary Judgment is only appropriate when there are no issues of material fact and the moving party is entitled to Judgment of the matter of law.   (See Fed. R. Civ. Pro. 56 (C)). In deciding a Motion for Summary Judgment, the court must view the evidence and draw all reasonable inferences in favor the non-moving party. See <u>Matsushita Elec. Indus. Co. v., Zenith Radio Corp.</u>, 475 US 574, 587, 106 St. 1348 (1986). The judge is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial".   <u>Anderson v. Liberty Lobby, Inc.</u>, 477 US 242, 249, 106 S. Ct. 2505 (1986).   A genuine issue for trial is presented when there is sufficient "evidence on which the jury could reasonably find for the [non-moving party]". (*Id.,* at 252).

**B.       *Product Liability Law***

Plaintiffs would agree with the product liability authority as set forth on page 7 through the first full paragraph on page 8 of CMI's Memorandum in Support of Motion for Summary Judgment.

From the time the Sutter machines were placed in the Ironton Intermet foundry in 1992 until the death of Carl Simpson in 1999, no operational safety devices were placed on the Sutter machine to protect employees from unguarded pinchpoints created by the operation or maintenance of the Sutter machines.   (Kelley Affidavit, Paragraphs 8 and 9, "Exhibit 3"; Stapleton Affidavit, Paragraphs 6 through 9, attached hereto and marked as "Exhibit 4"; Ted Lambert Affidavit, Paragraphs 7 through 9, attached hereto and marked

as "Exhibit 5").

During the installation of the Sutter machines at the Ironton Intermet plant in 1992, correspondence between Intermet and CMI demonstrate there was at least some concern that the accidental closing of the Sutter machines during cleaning or other maintenance operations would result in injury. (See Discovery Document Bates Numbered: HL40-41, 41-1, and 41-2 attached hereto and marked as "Exhibit 6", highlights not in original). This correspondence from CMI to Intermet discussed the possibility of incorporating a swing stop. (See paragraph 3 of "Exhibit 6"). Such a swing stop would be mounted to the Sutter machine columns and would be manually positioned to prevent employee injuries. Unfortunately, this safety swing stop was never installed on the Sutter machines at Intermet. (Supervisor Mullins, pp. 58-59).

Another more inexpensive option to the swing stop, which was recommended by Defendant CMI, would have been the incorporation or the required use of die blocks. Die blocks could be inserted into a pinchpoint while the machine was being serviced by the employees to prevent crush injuries. Yet, use of die blocks was not mandated by Intermet and only used occasionally by operators based upon individual initiative. (Stapleton, pp. 66-68, 78-79; Lambert, p. 65; Stevens, p. 29; Kelley, p. 64).

Gary Maul, Ph.D., design expert as retained by Plaintiffs, has stated that die blocks as described in CFR 1910.218 were not incorporated by CMI. (Maul, pp. 60-62, 69-70). Also, Gary Maul testified that with the use of die blocks or incorporation of a swing stop, Carl Simpson's injury

would not have occurred.  (Maul, pp. 93, 126-127).

Light curtains and/or light beams, similar to those seen on every automatic garage door opener, would have also been another viable safety precaution for the Sutter machines. While Intermet made an attempt to put light curtains on the Sutter machines for safety purposes, such attempts lasted only a day or two and were immediately disconnected as they slowed production.  (Supervisor Wilburn, p. 28; Supervisor Ramey, pp. 41-42; Stapleton, pp. 40-41; Lambert, pp.47-48).   Light curtains or light beams are generally connected to the machine's control panel to either ensure guards are in place prior to creating a pinchpoint, or in the alternative, such devices immediately disable a machine if someone or something enters the area of the point of operation.  (Maul, pp. 58-59).

Expert Gary Maul also testified that the Sutter machine as supplied by CMI was defective for failing to incorporate an emergency stop button located in close proximity to the helper.  (Maul, p. 53).  Maul describes the Sutter machine as provided from CMI to Intermet as only providing a master-stop at the control panel, which is inaccessible to the helper.  (Maul, pp. 56-57).

In addition, Gary Maul describes the Sutter machine as manufactured by CMI as defective for the failure to incorporate an audible warning and/or strobe light to indicate to the helper and operator that the machine was coming out of an idle state.  (Maul, pp. 66, 117-118).

CMI relies heavily on the ANSI Standards as attached to their Memorandum in Support of their Motion for the assertion that CMI complied with its duty to warn Intermet of

potential hazards while operating the Sutter machine. Interestingly, the same ANSI Standards set forth the manufacturer's requirements as it relates to barrier guards and stop blocks. Relevant portions of the ANSI Standards are set forth and attached as "Exhibit 7". ANSI Standard 5.3.2.1 states:

> "**Core making equipment.** Hazardous areas and zones on core making equipment shall be guarded by one or more of the methods under Section 5.2 of this standard." (See "Exhibit 7").

Section 5.2 states:

> "**Guarding Within the Operator's Work Zone(s).** Potential hazards including, but not limited to, nip, pinch, shear, puncture, and/or catching points or zones in the operator's work zone shall be guarded against by a barrier guard or protective device(s)."

Section 5.1 of the ANSI Standards sets forth the responsibility of a manufacturer and states under 5.1.1:

> "**Manufacturer.** The manufacturer of the equipment shall furnish equipment that complies with the mandatory safety standards for a given category of equipment.

Further, the manufacturer's responsibility is stated under 3.2.1.1, which states:

> "**Manufacturer.** The manufacturer shall endeavor to eliminate the hazards by design or provide protection against them. In cases in which the hazards cannot be eliminated by design or protection within practical limits, the manufacturer shall warn against them by using signs."

Safety/OSHA enforcement expert, Perry Jones, has opined that the Sutter machine as supplied by CMI was in

violation of 29 CFR 1910.212(a)(3)(ii), for its failure to guard. (Jones, p. 51). Also, Perry Jones has indicated that in his years of experience, it was his observation that he had never seen a machine that could not be guarded to protect the employees. There was no question in Mr. Jones' mind that the Sutter machine as provided by CMI to Intermet should have been guarded. (Jones, pp. 54, 59-60).

Intermet's Vice President, John Allread, was aware that OSHA required guards to protect the operator and helper of the Sutter machines. (Allread, pp. 76-77). Yet, at no time prior to Mr. Simpson's incident were the Sutter machines at Intermet equipped with guards/gates to protect the employees. (Wilburn, pp. 33-34; Lambert, p. 41).

The application of the facts as set forth above demonstrates that the Sutter machine as supplied by CMI was defectively manufactured by failing to adequately guard the pinchpoints created during the operation of the Sutter machines.

"Exhibit 8" as set forth below demonstrates that, following Mr. Simpson's death, guards incorporating the use of a light beam were placed on the Sutter machines. These guards protected the employees from the point of operation of the Sutter machines. "Exhibit 8" is being set forth to demonstrate and eliminate CMI's argument that it was not feasible or an otherwise acceptable alternative to provide guarding on the Sutter machines as provided to Intermet.



Photograph provided to plaintiffs by defendants.   Attached hereto and marked as "Exhibit 8".

Plaintiffs have shown that the machine was defective and testimony as set forth by expert Gary Maul shows that there was a duty owed to decedent, Carl Simpson, and that the breach of this duty was a proximate cause of his death. (Maul, pp. 73, 126-127).  In addition to the failure to guard against the pinchpoints created by the Sutter machine, numerous other safety devices were not incorporated in the manufacture of the Sutter machines by CMI.  These defects include the failure of CMI to incorporate the use of emergency stop buttons accessible to the helpers.  (Maul, pp. 53, 56-57, 117-120).

In addition to the testimony of Plaintiffs' experts, the ANSI Standards as relied upon by CMI clearly demonstrate that the Sutter machine was defective in its manufacturing.

**C.      *Alleged Alterations***

CMI alleges that Intermet substantially altered the activation system of the Sutter machines by allowing its employees to turn the machine on from the back, using solenoid valves to override the control panel.   In support of this assertion, CMI cites James Brammer's deposition, pages 44 through 50.   (See page 5, last paragraph and first full paragraph of page 10 of CMI's Memorandum in Support of Motion for Summary Judgment).   However, Plaintiffs would contend that a close reading of Brammer's deposition, specifically pages 44 through 50, does not support the assertion that there was a substantial alteration.   In fact, it is a distortion of the evidence contained within those pages of Brammer's transcript.

A review of Thomas Stapleton's deposition, pages 14 through 19, indicate that the Sutter machines as supplied by CMI to Intermet were not altered as it relates to the method of raising the cope to the gas head.  Mr. Stapleton was hired by Intermet in March of 1993 and describes the B-1 and B-2 Sutter machines as nearly identical to each other. (Stapleton, p. 14).  Further, he indicates that the B-1 and B-2 Sutter machines as supplied by CMI had no significant differences in operation or the location of the valves and switches.  (*Id.*).  Stapleton, in pages 15 through 18 of his deposition, extensively describes the LOTO procedure incorporated when an operator would experience a sticker in the top of the cope.  On page 19 of his deposition, Stapleton describes the requirement that the operator would have to leave the control panel, go to the opposite side of the machine to manually activate a solenoid valve to raise the cope back to the gas head.  (Stapleton, p. 19).  Then, the operator would return to the control panel to put the machine

in automatic. (*Id.*). As mentioned, Stapleton states that the LOTO procedures between 1993 to the end of his employment were the same and he worked on the Sutter machines until the plant was closed in 2000. (Stapleton, pp. 8-9, 14).

These facts strongly support Plaintiffs' assertion that the Sutter machines, as supplied by CMI, were defective in the fact that the computer controls failed to allow the operator to raise the cope back to the gas head from the control panel following the removal of a sticker. While various engineers have testified that the programmable logic control (hereinafter referred to as "PLC") provided for this operation electronically from the control panel, yet the actual day-to-day process as described by Mr. Stapleton is quite different.

Even if CMI were to substantiate the allegation that there was an alteration performed by Intermet, the fact remains that CMI failed to adequately guard against the pinchpoints renders the machine defective. The evidence demonstrated herein by expert, Gary Maul, demonstrates that a proper interlocking guard prevents machine movements if an employee is inside the point of operation. (Maul, pp. 26-27).

There exists a genuine issue of material fact as to whether the machine was substantially altered after it left CMI. Thus, summary judgment is not appropriate.

## IV.   CONCLUSION

The facts as set forth herein show that the Sutter machine was defective as manufactured by CMI. Further, CMI has failed to comply with relevant federal regulations and relevant ANSI Standards. Granted, CMI has produced testimony

from company representatives that the Sutter machine met the applicable design and manufacturing specifications; however, Plaintiffs have produced facts that demonstrate there are genuine issues of material fact as to each of these issues, making summary judgment inappropriate for this case.

Based upon the statements made by employees and Plaintiffs' experts herein, it is clear that there exists genuine issues of material fact as to whether or not the machine was free of defects when it left the manufacturer's hands.   Plaintiffs indicated that there existed several manufacturing design defects in the re-manufacture of the Sutter machines by CMI.   This is contrary to the statements given by the Defendant CMI in its Motion for Summary Judgment concerning the machine being properly manufactured and designed.   Thus, there exists a genuine issue of material as to whether or not the machine was defective in its manufacture and design.

Therefore, Plaintiffs respectfully request that the Court deny CMI's Motion for Summary Judgment.

LAMBERT, McWHORTER & BOWLING

 /s/ Randall L. Lambert
RANDALL L. LAMBERT (0017987)
D. SCOTT BOWLING (0067617)
COUNSEL FOR PLAINTIFFS
215 SOUTH 4TH STREET
P. O. BOX 725
IRONTON, OH  45638
(740) 532-4333


### CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing Memorandum in Opposition to Defendant CMI's Motion for Summary

Judgment was served by electronic filing and U. S. regular mail

on this the <u>27th</u> day of May, 2004, upon the following:


Lawrence J. Barty, Esquire       Mark T. Hayden, Esquire
Patricia Anderson Pryor, Esquire Nancy J. Bride, Esquire
188 First Tower                  2800 Chemed Center
4525 Walnut Street               255 East Fifth Street
Cincinnati, OH  45202-3957       Cincinnati, OH  45202
Counsel for Defendant, Intermet  Counsel for Defendant,
Corporation and Ironton Iron      Hayes-Lemmerz


                                 LAMBERT, McWHORTER & BOWLING

                                  <u>/s/ Randall L. Lambert</u>
                                 RANDALL L. LAMBERT (0017987)
                                 D. SCOTT BOWLING (0067617)
                                 COUNSEL FOR PLAINTIFFS