Westlaw.

30 F.3d 135 (Table)
**Unpublished Disposition**

**(Cite as: 30 F.3d 135, 1994 WL 389197 (6th Cir.(Ohio)))**

**C**
NOTICE:   THIS   IS   AN   UNPUBLISHED
OPINION.

(The Court's decision is referenced in a "Table of
Decisions Without Reported Opinions" appearing in
the Federal Reporter. Use FI CTA6 Rule 28 and FI
CTA6 IOP 206 for rules regarding the citation of
unpublished opinions.)

United States Court of Appeals, Sixth Circuit.

Paul WALLACE, Plaintiff-Appellant,
v.
Robert MAMULA and City of Steubenville,
Defendants-Appellees.

**No. 93-3603.**

July 26, 1994.

On Appeal from the United States District Court
for the Southern District of Ohio, No. 91-01107;
George C. Smith, Judge.

S.D. Ohio

AFFIRMED.

Before: KENNEDY and BOGGS, Circuit Judges;
and HILLMAN, Senior District Judge. [FN*]

PER CURIAM.

**\*\*1** Paul Wallace appeals from the district court's
grant of summary judgment in favor of the
defendants, Police Officer Robert Mamula and the
City of Steubenville in this 42 U.S.C. § 1983 action.

Wallace maintains that the defendants violated his
First, Fourth, and Fourteenth Amendment rights by
arresting him. In his motion for summary
judgment, Wallace argued that the State's
disposition of the charges against him had a
preclusive effect in federal court. Wallace also
moved for summary judgment on the issue of
Mamula's and Steubenville's liability. The
defendants also moved for summary judgment,
arguing that Mamula was entitled to qualified
immunity and that there was no evidence that
Steubenville had a policy or practice of denying its
citizens' constitutional rights or acted with
deliberate indifference to those rights. The court
denied Wallace's motion for summary judgment and
granted the defendants' motion. For the reasons
explained below, we reverse the district court's
grant of summary judgment in favor of Mamula and
we affirm the district court's decision in every other
respect.

I
On the evening of November 25, 1990, Wallace
and several friends decided to go to a nightclub
called Fanny's Bar in Steubenville, Ohio. They
parked in a lot about a block from the nightclub and
were walking towards the club when Wallace
stopped to talk to someone he knew. While he was
talking to his friend, Police Officer Mamula pulled
up in his cruiser. According to Mamula, there were
several people on the sidewalk; he got out of his
car and attempted to clear the area by telling people
to move along.

During this time, Wallace apparently continued
talking to his friend. In his deposition, Wallace
stated that the night was chilly and since he was not
wearing gloves, he had one hand in his coat pocket
and one hand inside his coat. Mamula approached
Wallace and told him to take his hand out of his
coat. Wallace did not immediately agree to do so.
After two or three requests, Wallace complied. As
Mamula was walking away, Wallace claimed he
said, "[w]hy are you always coming down here
messing with the black man?" According to

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

30 F.3d 135 (Table)
**Unpublished Disposition**

**(Cite as: 30 F.3d 135, 1994 WL 389197 (6th Cir.(Ohio)))**

Mamula, Wallace said "[w]hy are all the fucking pigs always fucking with the black man?" Mamula also testified that Wallace said: "We're not going to put up with this BS"; "We're not going to be pushed around"; "These pigs can go fuck themselves".

After Wallace made his comment(s), Mamula turned around and started walking towards Wallace. He told Wallace that he was under arrest for disorderly conduct. Wallace ran. Mamula chased Wallace for about a block, at which point Wallace saw another police cruiser and stopped running. When Mamula caught up with Wallace, he placed him under arrest for disorderly conduct and resisting arrest. These criminal charges were dismissed with prejudice, however, after the state court found that the charges violated Wallace's constitutional right to free speech.

Wallace then filed this 42 U.S.C. § 1983 action, asserting that Mamula and Steubenville violated his constitutional rights. He also asserted several state claims. On cross-motions for summary judgment, the district court denied Wallace's motion and granted summary judgment for the defendants. The district court rejected Wallace's argument that the state court's disposition of the criminal charges prevented Mamula from re-litigating the First Amendment issue. The court also found that Mamula was entitled to qualified immunity and that Steubenville was not liable because Wallace had failed to produce any evidence that it made a deliberate or conscious choice not to provide adequate training to its officers. The district court also dismissed without prejudice Wallace's state claims.

**\*2** Wallace then filed this timely appeal.

## II

We review *de novo* a district court's grant of summary judgment. *Baggs v. Eagle-Picher Indus., Inc.,* 957 F.2d 268, 271 (6th Cir.), *cert. denied,* 113 S.Ct. 466 (1992). We will affirm the district court's order only if we determine that the pleadings, affidavits, and other submissions show "that there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law." Fed.R.Civ.P. 5 6(c). All evidence is viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986).

The moving party need not support its motion with evidence disproving the non-moving party's claim, but need only show that "there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554 (1986). The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512 (1986).

### A

Wallace first argues that he is entitled to summary judgment on the issue of the defendants' violation of his First Amendment rights because an Ohio criminal court dismissed the action against him on those grounds. He contends that by virtue of the state court's disposition, the First Amendment issue is subject either to the doctrine of issue preclusion or to the doctrine of claim preclusion. Federal courts are generally required to give the same preclusive effect to a state court judgment as the state court would in a similar circumstance. 28 U.S.C. § 1738. To determine the effect of a state court proceeding, the federal court must look to the laws of the state in which the proceeding took place. *Kremer v. Chemical Constr. Corp.,* 456 U.S. 461, 466, 102 S.Ct. 1883, 1889 (1982).

As long as the party against whom the doctrine is invoked had a full and fair opportunity to litigate the issue, a federal court can collaterally estop a party from re-litigating a constitutional matter in a 42 U.S.C. § 1983 action. *Allen v. McCurry,* 449 U.S. 90, 101, 103-04, 101 S.Ct. 411, 418, 419-20 (1980). The law in Ohio is well-settled on this issue:

> In order to assert collateral estoppel successfully, a party must plead and prove the following elements:
> (1) The party against whom estoppel is sought was a party or in privity with a party to the prior

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

30 F.3d 135 (Table)
**Unpublished Disposition**

**(Cite as: 30 F.3d 135, 1994 WL 389197 (6th Cir.(Ohio)))**

action;
(2) There was a final judgment on the merits in the previous case after a full and fair opportunity to litigate the issue;
(3) The issue must have been admitted or actually tried and decided and must be necessary to the final judgment; and
(4) The issue must have been identical to the issue involved in the prior suit.
*Monahan v. Eagle Picher Indus., Inc.,* 486 N.E.2d 1165, 1168 (Ohio Ct.App.1984); *see also Goodson v. McDonough Power Equipment, Inc.,* 443 N.E.2d 978, 981 (Ohio 1983).

**\*\*3** The district court in this case surveyed in detail the cases in which a § 1983 plaintiff claimed that a disposition in a state criminal trial collaterally estopped the defendant from re-litigating a constitutional issue. The case most directly on point is *Schwab v. Wood,* 767 F.Supp. 574 (D.Del.1991). In *Schwab,* the court held that a § 1983 plaintiff could not use the doctrine of collateral estoppel offensively against police officers. In that case, Schwab was arrested after refusing to produce identification or to get out of his truck when police officers requested him to do so. When the police officers forced him out of the truck, a scuffle ensued. *Id.* at 578. Schwab was finally pinned to the ground by two officers and he was charged, *inter alia,* with resisting arrest. *Id.* at 579. At trial, however, the court dismissed all charges against Schwab on the grounds that the police officers did not have a reasonable suspicion that Schwab was committing or had committed a crime. *Ibid.*

Schwab then filed a § 1983 action against the police officers. He moved for partial summary judgment on the grounds that the officers were collaterally estopped from re-litigating the "reasonable suspicion" issue. *Id.* at 581. He argued that the police officers were in privity with the state by virtue of the officers' participation in the criminal trial. *Ibid.* The court, however, found that the officers "did not have an interest which was bound by the previous proceeding. Moreover, they simply had no direct personal interest whatsoever in the state criminal proceeding against Schwab." *Id.* at 582. The court underscored the lack of privity by noting that the roles of the parties had "substantially changed as compared to the previous

state criminal proceeding." *Ibid.* The court held that the officers did not have a full and fair opportunity to litigate the issue since they had no control over the proceeding and they did not participate "substantially" in the control over the state's presentation of the case. The court also noted that the officers had no reason to assert any defenses that would otherwise be applicable in a civil suit, and that they had no right to appeal the criminal proceeding, all of which denied them a full opportunity to contest the finding. *Id.* at 583.

The rationale in *Schwab* applies to Wallace's case. Here, Mamula was **not a party** to the criminal **action**. Thus, Wallace must show that Mamula was in privity with the State of Ohio before the doctrine of **collateral estoppel** applies. To do this, he must show that all of the parties to the present proceeding were bound by the prior proceeding. *Goodson v. McDonough Power Equip., Inc.,* 443 N.E.2d 978, syll. ¶ 1 (Ohio 1983). In this case, there is no indication that there was an identity of interest between Mamula and the State of Ohio such that he would be bound by the State's conduct in the criminal case. Thus, Wallace cannot show that Mamula was in privity with the State of Ohio.

**\*\*4** Wallace's argument also fails because Mamula did not have a full and fair opportunity to litigate the First Amendment issue. First, Mamula did not have a fair opportunity to litigate the issue because he was not a party and thus could not assert any defenses to Wallace's assertion that Mamula violated his constitutional rights. Second, Mamula did not have a full opportunity to litigate the issue because the order dismissing Wallace's case was not appealable.

Since there was no privity between Mamula and the State of Ohio in the criminal case and since Mamula did not have a full and fair opportunity to litigate the issue, the district court was correct in finding that Mamula was not collaterally estopped under Ohio law from re-litigating the First Amendment issue in federal court.

Wallace also contends that his First Amendment claim is subject to the doctrine of claim preclusion. Claim preclusion acts as a bar to or a merger of a second action upon the same claim. *Johnson's*

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

**(Cite as: 30 F.3d 135, 1994 WL 389197 (6th Cir.(Ohio)))**

*Island, Inc. v. Board of Township Trustees,* 431 N.E.2d 672, 674 (Ohio 1982). The district court correctly concluded that the doctrine of claim preclusion was inapplicable to Wallace's § 1983 claim since the previous action was a criminal action, and thus was necessarily a different claim than the present civil action. *See Williams v. Ohio Bureau of Motor Vehicles,* 610 N.E.2d 1229, 1231 (Ohio Ct.Ap.1992). Consequently, the district court properly denied Wallace's motion for summary judgment on this issue.

B

Wallace's second argument is that he is entitled to partial summary judgment on the issue of Mamula's liability for violating his First and Fourth Amendment rights. "Government officials performing discretionary functions are afforded qualified immunity, shielding them from civil damages, as long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Poe v. Haydon,* 853 F.2d 418, 423 (6th Cir.1988) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2735 (1982)), *cert. denied,* 488 U.S. 1007, 109 S.Ct. 788 (1989). "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action." *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 3038 (1987) (quoting *Harlow,* 457 U.S. at 819, 102 S.Ct. at 2739). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.... [I]n the light of pre-existing law the unlawfulness must be apparent." *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039. In the context of a motion for summary judgment, "this inquiry will turn on the circumstances with which the official is confronted, and often on the information that he possesses...." *Poe,* 853 F.2d at 425. "[T]he district court must consider all the undisputed evidence produced as a result of discovery, read in the light most favorable to the non-moving party." *Ibid.*

**5** Since the right to free speech and the right to be free from unreasonable search and seizure are clearly established, the focus in Wallace's case is whether a police officer in Mamula's position should have known that his own conduct was unlawful. This court addressed a similar issue in *Johnson v. Estate of Laccheo,* 935 F.2d 109 (6th Cir.1991). In that case, the plaintiff, a security guard, claimed that his First Amendment rights were violated when police officers arrested him after Johnson prevented one of the officers from following a car onto Johnson's employer's premises. *Id.* at 110. Johnson was later charged with interfering with official business. *Id.* at 111.

The charges against Johnson were dismissed and he filed a § 1983 suit against the officers who arrested him. He claimed that the officers violated his First Amendment rights by arresting him for saying "No" when they asked to enter the premises. *Id.* at 112. The district court denied the defendants' motion for summary judgment, holding there was an issue of fact whether reasonable officers could have believed they had probable cause to arrest Johnson. *Id.* at 111.

 On appeal, this court reversed the district court. The court found that the defendants were entitled to qualified immunity because they did not violate a clearly established right since Johnson was arrested for his act of refusing to admit the officers, not for his speech. *Id.* at 112. The court also found that even if the officers had in fact violated Johnson's First Amendment rights, they were still entitled to qualified immunity. The court considered the statute under which Johnson was arrested and concluded that "a reasonable officer in like circumstances could have reasonably believed that Johnson's arrest was lawful." *Ibid.*

The rationale in *Johnson* is applicable to Wallace's case. According to Mamula, he and his partner were in an area of town that had a history of problems. Mamula testified that there were 15 or 20 people milling about the street around Fanny's Bar and that some of the people were in the street and had open containers of alcohol. Mamula claims that he told people to move along because they were loitering, that he noticed Wallace put his hand inside his coat jacket, and that he ordered Wallace several times to remove his hand from his jacket. According to Mamula, Wallace refused to comply and made coarse and abusive comments

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

30 F.3d 135 (Table)
**Unpublished Disposition**

**(Cite as: 30 F.3d 135, 1994 WL 389197 (6th Cir.(Ohio)))**

about the police, but when Wallace finally withdrew his hand from his jacket, Mamula started back toward his cruiser.

Mamula testified that Wallace began inciting the crowd with a harangue directed at police officers in general and Mamula in specific. Mamula claims that Wallace addressed the crowd, waved his arms, and had the effect of keeping the crowd from dispersing, despite Mamula's orders. Mamula testified that, at this point, he decided to arrest Wallace for disorderly conduct. Mamula also indicated that he did not arrest Wallace for what he said, but because of the "combination of his actions, the actions of other people and the words that he used."

**\*\*6** If the events happened as Mamula described, Wallace's actions would probably have led Mamula reasonably to believe that Wallace's conduct was disorderly. The ordinance under which Wallace was arrested defines "disorderly conduct" as "[m]aking unreasonable noise or offensively coarse utterance, gesture or display, or communicating unwarranted and grossly abusive language to any person, which by its very utterance or usage inflicts injury or tends to incite and [*sic* ] immediate breach of the peace." [FN1] If the facts are as Mamula asserts, an officer in similar circumstances could reasonably have believed that Wallace was engaging in disorderly conduct.

The problem, however, is that Wallace has told a significantly different story. In his complaint, deposition, and motion for summary judgment, Wallace asserted that he only made the one innocuous comment to Mamula, who then turned on him. Wallace stated in his affidavit that
> As I walked away I commented "why are you always coming down here messing with the black man?" I said this quietly, in a normal, conversational tone. I did not yell. I was not speaking directly to this policeman. I was voicing my frustration with being interrupted and ordered around by a policeman when I was merely standing in a public place talking to an old friend.
> This comment was the *only* thing I said. I said it only once.

Wallace also submitted affidavits from three other

people that support his version of events.

Despite this apparent genuine issue of material fact, the district court granted summary judgment to Mamula on the grounds that only Mamula's testimony was reliable. The court discounted Wallace's affidavits because Wallace was unclear on the number of times Mamula asked him to remove his hand and Wallace claimed in his affidavit that the crowd was not boisterous, whereas in his deposition he claimed that people were "hollering." The court found that Wallace was attempting to change his testimony in mid-stream. The court relied solely on the three pages of Wallace's deposition that were made part of the record.

Even if the court was correct in relying only on Wallace's deposition, *see, e.g., Reid v. Sears, Roebuck and Co.,* 790 F.2d 453, 460 (6th Cir.1986) , the court erred in granting summary judgment to Mamula on the issue of the reasonableness of his belief that Wallace was breaking the law. The two versions of events before the court are enough to create a genuine issue of fact as to whether Mamula acted reasonably in arresting Wallace for disorderly conduct because his language was so unreasonably loud or offensively coarse that it inflicted injury by its very utterance or tended to incite an immediate breach of the peace.

In *Johnson,* we reversed the district court because it failed to look at the statute under which the plaintiff had been arrested and to compare it to the facts available to the officer at the time of the arrest. The district court made the same error here. The ordinance under which Wallace was charged focuses on the type of language used and the effect of that language on others. To show that his actions were reasonable, Mamula must show that there is no genuine issue of fact as to the coarse or abusive nature of Wallace's comments. In his deposition, however, Wallace stated that his only remark was, "Why are you always coming and messing with the black man?" and he has submitted affidavits that support his version of events. On this key issue, then, there are two stories that cannot be squared by referring to the record.

**\*\*7** Moreover, there is a genuine issue of fact as to

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

30 F.3d 135 (Table)                                                                                 Page 6
Unpublished Disposition

**(Cite as: 30 F.3d 135, 1994 WL 389197 (6th Cir.(Ohio)))**

whether Wallace's comment(s) tended to incite an immediate breach of the peace. In its order granting summary judgment to Mamula, the district court considered only Wallace's deposition [FN2] since it found discrepancies between Wallace's deposition and his later affidavit. The district court concluded that "in a tense, uncertain, rapidly evolving and possibly dangerous situation, Mamula's decision to arrest Wallace was not objectively unreasonable." While we do not question the court's decision to rely only on Wallace's deposition on the issue of the behavior of the crowd, we note that the district court failed to analyze the facts as presented by Wallace's and Mamula's depositions in light of the statute under which Wallace was arrested. As we have indicated elsewhere, there is a genuine issue of fact as to what Wallace said, and this, in turn, affects the analysis of whether Wallace's words were of the sort that a reasonable police officer could believe tended to incite an immediate breach of the peace. *Cf. Brandenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 1829 (1969) ("the constitutional guarantees of free speech ... do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action"). Consequently, the district court erred in granting summary judgment to Mamula on this issue.

C

Finally, Wallace claims that the district court incorrectly granted summary judgment on the issue of Steubenville's liability for violating his rights. A municipality may be held liable under 42 U.S.C. § 1983 when it has a "policy or custom" that is the "moving force" behind a constitutional deprivation. *Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 3105 (1985). In some circumstances, a police department's failure to train its officers will give rise to liability if the city was deliberately indifferent to the rights of the people with whom the officers come in contact. *Canton v. Harris,* 489 U.S. 378, 388 109 S.Ct. 1197, 1204 (1989). However, " 'merely colorable' evidence" of a city's failure to train its officers and of its deliberate indifference to the lack of training "will not withstand a *well-supported* motion for summary

judgment." *Bills v. Aseltine,* 958 F.2d 697, 708 (6th Cir.1992) (emphasis added).

In *Bills,* we held that a plaintiff's conclusory allegations based on a single incident of unconstitutional police activity could not overcome a motion for summary judgment. In that case, the plaintiff claimed that police officers violated her Fourth Amendment rights when they searched her home. In an effort to prove municipality liability, she asserted that since the officers had "some seniority within their departments, they must be responsible for policy, and therefore, the municipalities have such policies." *Ibid.* We rejected this argument, finding that the plaintiff's evidence was "nothing more than the inference she draws from a single, allegedly unconstitutional action." *Ibid.*

**8 As in *Bills,* Wallace has not offered " 'any significant probative evidence tending to support the complaint.' " *Liberty Lobby,* 477 U.S. at 249, 106 S.Ct. at 2510 (quoting *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 1593 (1968)). Wallace alleged in his memorandum in opposition to Steubenville's motion for summary judgment that he had a "*massive* amount of evidence that police misconduct has been rampant for years" and that the City had actively condoned such malfeasance. Wallace claimed that he had 30 witnesses on this issue and could produce 20 victims who had recovered damages from the city for violations of their rights. He did not, however, present any other evidence on this issue.

We agree with the district court that Wallace has failed to create a genuine issue of fact as to Steubenville's liability. It was incumbent upon Wallace to proffer sufficient evidence for a jury to return a verdict in his favor. Instead, he chose to rely on conclusory allegations to support his contention that Steubenville was deliberately indifferent to the fact that its officers violated citizens' constitutional rights. Since a reasonable jury could not return a verdict for Wallace based on this evidence, we affirm the district court's grant of summary judgment for Steubenville.

III

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

**(Cite as: 30 F.3d 135, 1994 WL 389197 (6th Cir.(Ohio)))**

In conclusion, we AFFIRM IN PART and REVERSE IN PART the decision below and REMAND this case to the district court. We AFFIRM the district court's decision that the disposition of Wallace's criminal proceeding did not preclude relitigation of the First Amendment issue in a civil case. We also AFFIRM the district court's grant of summary judgment in favor of Steubenville. However, without expressing any opinion as to the merits of Wallace's claims, we REVERSE the district court's grant of summary judgment in favor of Mamula on the issue of qualified immunity. In order to sustain Mamula's claim of qualified immunity, a trier of fact must determine that a reasonable official in Mamula's position could have believed that Wallace's comment(s) violated Steubenville City Ordinance § 509.03(a)(2) and that a reasonable official in Mamula's position could have believed that the ordinance is constitutional. Accordingly, the judgment of the district court is vacated in part and remanded for proceedings consistent with this opinion.

FN* The Honorable Douglas W. Hillman, Senior United States District Judge for the Western District of Michigan, sitting by designation.

FN1. This statute tracks the language of *Chaplinsky v. New Hampshire,* 315 U.S. 568, 62 S.Ct. 766 (1942). In *Chaplinsky,* the Court held that "certain well-defined and narrowly limited classes of speech" may be prohibited without offending the Constitution. 315 U.S. at 571, 62 S.Ct. at 769. One such class of speech is " 'fighting' words--those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." 315 U.S. at 572, 62 S.Ct. at 769. Although the Court has often cited the holding in *Chaplinsky,* it has rarely upheld a conviction under a *Chaplinsky* -type statute. *See, e.g., Texas v. Johnson,* 491 U.S. 397, 109 S.Ct. 2533 (1989) (burning of flag does not constitute "fighting words"); *Hess v. Indiana,* 414 U.S. 105,

94 S.Ct. 326 (1973) (opprobious comment not directed at anyone in particular does not constitute "fighting words"); *Norwell v. City of Cincinnati,* 414 U.S. 14, 94 S.Ct. 187 (1973) (nonprovocative voicing of objection to "highly questionable detention" does not constitute "fighting words"); *Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780 (1971) (public display of single four-letter word does not constitute "fighting words").

FN2. In fact, the court considered only three pages of Wallace's deposition, which were attached to the defendants' motion for summary judgment. Wallace did not enter his deposition into the record.

30 F.3d 135 (Table), 1994 WL 389197 (6th Cir.(Ohio)), Unpublished Disposition

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Westlaw.

99 F.3d 1139 (Table)
**Unpublished Disposition**

**(Cite as: 99 F.3d 1139, 1996 WL 593598 (6th Cir.(Ohio)))**

NOTICE:  THIS  IS  AN  UNPUBLISHED
OPINION.

(The Court's decision is referenced in a "Table of
Decisions Without Reported Opinions" appearing in
the Federal Reporter. Use FI CTA6 Rule 28 and FI
CTA6 IOP 206 for rules regarding the citation of
unpublished opinions.)

United States Court of Appeals, Sixth Circuit.

Avundia T. RODRIGUEZ, Plaintiff-Appellant,
v.
SUN COMPANY, INC. (R & M),
Defendant-Appellee.

**No. 95-3869.**

Oct. 15, 1996.

On Appeal from the United States District Court
for the Northern District of Ohio, No. 93-07442;
James G. Carr, Judge.

N.D.Ohio

AFFIRMED.

Before: SUHRHEINRICH and MOORE, Circuit
Judges, and McKINLEY, District Judge. [FN*]

FN* The Honorable Joseph H. McKinley,
Jr., United States District Judge for the
Western District of Kentucky, sitting by
designation.

OPINION

MOORE, Circuit Judge.

**\*1** Plaintiff-appellant Avundia T. Rodriguez
appeals  the  summary  judgment  for
defendant-appellee Sun Company in this diversity
case involving the intersection of Ohio workers'
compensation law and Ohio tort law. Because she
has not presented sufficient evidence to support a
finding of liability for intentional torts, we affirm
the district court's grant of summary judgment.

I

Rodriguez sustained severe burn injuries to her
face and hands in a flash fire of butane gas vapors at
Sun's Toledo oil refinery on December 29, 1990.
At that time, she was one of four fire marshals
employed in the refinery fire department. She had
been trained in fire protection, fire safety, and
hazardous materials emergencies. Joint Appendix
(J.A.) at 98, 722-25.

On the night of Rodriguez's injury, the systems in
the refinery's Plant 8, the alkylation unit, had
become overheated and overpressurized due to a
power failure. When operators restarted the unit,
they  failed  to  follow  established  procedures,
triggering a series of events that led to a release of
butane through the vent stack into the atmosphere at
approximately 9:00 p.m. J.A. at 311-15. A release
of butane into the atmosphere creates a severe fire
hazard. Vaporized butane expands to 270 times its
liquid volume. Because it is twice as heavy as air,
the gas descends and forms a cloud on the ground
that is highly flammable. Butane vapors can be
ignited by many sources, including motor vehicles.

After the butane release, William K. Rainey, Sr.,
the refinery fire chief, was called in from home.
He arrived at the refinery at 9:42, consulted Plant 8
control room personnel, and declared a fire standby.
J.A. at 315, 519-20. Rainey and Rodriguez put on
their "turnout gear," which consisted of inner and
outer protective coveralls, boots, helmet, safety
glasses,  gloves,  and  hood,  all  designed  for  fire

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

99 F.3d 1139 (Table)
**Unpublished Disposition**

**(Cite as: 99 F.3d 1139, 1996 WL 593598 (6th Cir.(Ohio)))**

protection; Rodriguez, however, then took off her hood while trying to start a fire pumper and forgot to take it with her when she took a different truck. *Id.* at 714-15. While Rodriguez obtained the fire truck, Rainey discussed the situation with the chief operator at Plant 8, Raul "Joe" Gloria, who told Rainey that butane was no longer being released, though the plant continued to experience high pressure and had the potential for another release.

After speaking with Gloria, Rainey instructed Rodriguez to park the pumper on a road passing northwest of Plant 8, about 120 feet from the vent stack. Although the road had been barricaded to keep out vehicular traffic, Rainey testified at his deposition that he chose that location because there was a hydrant by the road and because the spot was then out of the line of the wind blowing over the vent stack. [FN1] J.A. at 520-22. He told Rodriguez to lay a hose to the hydrant, but not to hook it up, so the truck would remain mobile and able to respond to any other location. *Id.* at 522-23. He also instructed her to stay with the truck, which was still running. Rodriguez told Rainey that she smelled butane in the area and that she thought the truck should be located farther from the vent stack. Rainey chose not to move the truck. *Id.* at 745-46.

FN1. The wind was then blowing from the northwest; it later changed direction, blowing the butane cloud that ignited and injured Rodriguez.

**\*\*2** Rainey stayed at the pumper with Rodriguez for at least twenty minutes over the next hour, leaving several times to check with Gloria as to the situation. J.A. at 752. At about 10:40 p.m., the radio dispatcher asked Rainey to go to the plant protection area of the refinery to evaluate a gaseous odor that had been detected. J.A. at 315. When he arrived there at approximately 10:45, he saw a visible cloud of butane moving south. *Id.* at 532-33. He ordered the area barricaded. *Id.* at 534. As he headed back to Rodriguez's position, he saw the flash fire that injured Rodriguez.

Waiting by the pumper, Rodriguez had heard the engine accelerating "up and down," probably

because the engine was pulling in butane vapor from the air. J.A. at 401, 461-62, 765-66. She entered the cab of the truck, leaving the driver's side door ajar, and removed her gloves to work the controls. *Id.* at 315-16, 766-67. The engine then died, followed by an explosion that blew Rodriguez from the cab. *Id.* at 316, 766-70. As she got to her feet, she was engulfed by a large flash fire that severely burned her hands and part of her face. *Id.* at 771. Rodriguez produced an expert who concluded that it was "likely that the fire truck was the ignition source for the vapor cloud." J.A. at 400.

Prior to December 29, 1990, the Plant 8 system had released butane into the atmosphere at least four times in three years, including once each in October and November 1990. J.A. at 353. Company documents indicate that Sun was aware of the potential hazards posed by such releases, and was also aware of alternatives to its venting system. *See, e.g., id.* at 352, 359, 368, 373, 374. Prior to December 29, 1990, the refinery had experienced no fires or explosions resulting from the previous butane releases.

II

We review a district court's grant of summary judgment de novo. *Hankins v. The Gap, Inc.,* 84 F.3d 797, 800 (6th Cir.1996). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Considering all facts and inferences drawn therefrom in the light most favorable to the appellant, we reverse the grant of summary judgment only upon a material error of law or a showing of the existence of a genuine issue of material fact. *Hankins,* 84 F.3d at 800 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

The exclusivity-of-remedy rule under Ohio's workers' compensation law limits an employee's tort remedies against her employer to intentional torts. *See generally Van Fossen v. Babcock & Wilcox Co.,* 522 N.E.2d 489, 499-502 (Ohio 1988). To prevail in a workplace intentional tort case under Ohio law, a plaintiff must demonstrate:

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

99 F.3d 1139 (Table)
**Unpublished Disposition**

**(Cite as: 99 F.3d 1139, 1996 WL 593598 (6th Cir.(Ohio)))**

(1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task.

**\*\*3** *Fyffe v. Jeno's, Inc.,* 570 N.E.2d 1108, 1109 (Ohio 1991) (syllabus para. 1) (modifying the test set out in *Van Fossen,* 522 N.E.2d at 491 (syllabus para. 5)). [FN2]

> FN2. "The syllabus of a[n Ohio] Supreme Court opinion states the controlling point or points of law decided in and necessarily arising from the facts of the specific case before the Court for adjudication." Ohio Supreme Court Rules for the Reporting of Opinions Rule 1(B) (1995). *See also Grover v. Eli Lilly and Co.,* 33 F.3d 716, 717 n. 1 (6th Cir.1994) ("In Ohio Supreme Court opinions, the syllabus contains the law of the case.") (citing *Donahey v. Edmondson,* 105 N.E. 269, 273 (Ohio 1913)).

The substantial certainty standard is "a significantly higher standard than even gross negligence or wantonness." *Zink v. Owens-Corning Fiberglas Corp.,* 584 N.E.2d 1303, 1308 (Ohio Ct.App.1991). The Ohio Supreme Court has emphasized that "proof beyond that required to prove negligence and beyond that required to prove recklessness must be established.... [T]he mere knowledge and appreciation of a risk--something short of a substantial certainty--is not intent." *Fyffe,* 570 N.E.2d at 1110 (syllabus para. 2) (modifying *Van Fossen,* 522 N.E.2d at 491-92 (syllabus para. 6) (citing W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 8, at 36 (5th ed. 1984))). A "plethora of negligence" is not sufficient to impose liability. *Wehri v. Countrymark, Inc.,* 612 N.E.2d 791, 793 (Ohio Ct.App.1992). Even knowledge of

"great risk" is not enough. *Howard v. Columbus Prods. Co.,* 611 N.E.2d 480, 484 (Ohio Ct.App.1992).

The *Fyffe* rule imposes a "harsh test," a "daunting standard." *Goodwin v. Karlshamns USA, Inc.,* 619 N.E.2d 508, 513 (Ohio Ct.App.1993); *Zink,* 584 N.E.2d at 1308, respectively. Intentional tort liability for workplace injuries is "limited to egregious cases." *Richie v. Rogers Cartage Co.,* 626 N.E.2d 1012, 1016 (Ohio Ct.App.1993); *see also Sanek v. Duracote Corp.,* 539 N.E.2d 1114, 1117 (Ohio 1989).

A

Rodriguez contends that Sun maintained a venting process for handling excess hydrocarbons that it knew created extremely hazardous conditions, that Sun knew there was a substantial certainty of injury to its employees arising from those conditions, and that Sun nevertheless continued to use the venting process.

Rodriguez points to internal documents in which Sun appeared to acknowledge the dangerous conditions created by its venting process. *See, e.g.,* J.A. at 352, 359, 368, 373, 374. Though the documents clearly demonstrate Sun's awareness of potential danger to its employees and a need to modify its system, they do not show that Sun's awareness rose to a level of "substantial certainty" that the potential consequences would materialize.

Rodriguez's expert evidence also is not sufficient to support a finding that a flash fire resulting in injury was substantially certain to occur, or that Sun knew it to be substantially certain. Rodriguez's expert stated his conclusions in terms only of possibilities and of what Sun should have known and done. *See* J.A. at 385-87.

Although the absence of prior fires or explosions is not dispositive of the issue of substantial certainty, it "certainly assists in showing knowledge of a substantial certainty of harm on the part of the employer." *Cook v. Cleveland Elec. Illuminating Co.,* 657 N.E.2d 356, 364 (Ohio Ct.App.1995). Given that Sun had experienced a number of releases of butane from the vent stack without any

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

99 F.3d 1139 (Table)
**Unpublished Disposition**

**(Cite as: 99 F.3d 1139, 1996 WL 593598 (6th Cir.(Ohio)))**

ignitions, the objective probability of a fire occurring appears to be, while perhaps a strong possibility, not a substantial certainty; at a minimum, the absence of previous ignitions detracts from Rodriguez's contention that Sun *knew* that an ignition was substantially certain to occur.

**\*\*4** Rodriguez further contends that Sun failed to provide adequate protective gear, knowing that an employee coming into direct contact with a fire or explosion without protective gear would be substantially certain to be injured. She alleges that Rainey was responsible for the absence of her protective hood, and that his failure to provide additional helpers at the standby necessitated her taking off her protective gloves to work the controls of the pumper. Rodriguez, however, has produced no evidence that anyone other than herself was responsible for her failure to wear her hood and gloves. Furthermore, she still must prove that Sun knew that a fire or explosion was substantially certain to occur. To hold that a defendant could be held liable based on the substantial certainty of injury if an employee were exposed to fire without requiring proof of substantial certainty of the fire or explosion itself would be to hold employers in inherently hazardous industries in effect strictly liable in tort for virtually any accident. Such a rule would invite any employees in hazardous industries who sustained injuries in the workplace to sue for intentional torts. This would stretch the exception to the exclusivity-of-remedy rule too far.

Rodriguez also seeks to hold Sun liable for the conduct of William Rainey in positioning her for the standby. She contends that Rainey knew that butane vapors were in the area, that he knew that stationing Rodriguez in the area with a running motor vehicle was substantially certain to harm her, and that he required her to stay with the truck under those circumstances. [FN3] She does not dispute Rainey's testimony that Joe Gloria had told him that the plant was no longer releasing butane. Even if the plant was in fact leaking or releasing continuously, as Rodriguez testified, she has not demonstrated that *Rainey knew* that it was.

FN3. The District Court noted that whether Sun could be held vicariously liable for the

alleged intentional acts of its supervising employee appeared to be an issue of first impression in Ohio. Because we affirm summary judgment for the defendant, we need not address this issue.

Rodriguez also has not shown that Rainey knew that ignition by the pumper of a flash fire that would injure the plaintiff was substantially certain to occur. She presents no evidence that Rainey knew that concentrated vapors would come into contact with the truck, or that the truck would ignite the butane. While the risk of such an occurrence may have been great, as her expert stated, Rodriguez has not shown that Rainey knew it to be so probable as to be substantially certain.

We believe it significant that Rainey was with Rodriguez at the pumper for at least one-third of the hour. We agree with the district court that it is illogical to believe that Rainey would have positioned himself in a location where he knew a flash fire or explosion was substantially certain to occur. *See Wehri v. Countrymark, Inc.,* 612 N.E.2d 791, 793, 794 (Ohio Ct.App.1992). If an explosion was substantially certain to occur at some point, every minute he spent at the pumper was a hazard to himself.

Rodriguez has not presented evidence of conduct so egregious as to fall under the narrow exception to the workers' compensation statute. Accordingly, we AFFIRM the grant of summary judgment for the defendant.

99 F.3d 1139 (Table), 1996 WL 593598 (6th Cir.(Ohio)), Unpublished Disposition

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works