IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

CARL G. SIMPSON AND BONNIE REED )
SIMPSON, CO-ADMINISTRATORS OF   )
THE ESTATE OF CARL D. SIMPSON,  )
                                )
        Plaintiffs,              )
                                )
vs.                             )   Case No. C-1-00-0014
                                )
INTERMET CORPORATION, et al.,   )
                                )
        Defendants.              )

THE DEPOSITION OF JOHN ALLREAD, produced, sworn, and examined on Tuesday, November 6, 2001, at 10:00 in the morning of that day, pursuant to Federal Rules of Civil Procedure, Subpoena, and Notice to Take Deposition at the offices of Court Reporting Advantage, 2042-A South Brentwood, in the City of Springfield, County of Greene, State of Missouri, before Christine Richele, Certified Shorthand Reporter, Registered Professional Reporter, Certified Court Reporter #385, and Notary Public, in a certain cause now pending in the United States District Court, for the Southern District of Ohio, Western Division, wherein the parties are as above set forth; taken on behalf of Defendant Hayes Lemmerz International - Equipment & Engineering, Inc.

1

A P P E A R A N C E S

For Plaintiffs:       Mr. D. Scott Bowling
                      Lambert, McWhorter & Bowling
                      215 South 4th Street
                      P.O. Box 725
                      Ironton, OH  45638
                      (740) 532-4333

For Defendant Intermet: Ms. Patricia Anderson Pryor
                      Taft, Stettinius & Hollister LLP
                      1800 Firstar Tower
                      425 Walnut Street
                      Cincinnati, OH  45202-3957
                      (513) 381-2838

For Defendant Georg Fischer:
                      Mr. Robert A. Flaugher
                      Lane, Alton & Horst LLC
                      175 South Third Street
                      Columbus, OH  43215-5100
                      (614) 233-4744

For Defendant Hayes Lemmerz:
                      Ms. Nancy J. Bride
                      Greenebaum, Doll & McDonald PLLC
                      2800 Chemed Center
                      255 East Fifth Street
                      Cincinnati, OH  45202-4728
                      (513) 455-7600

Also Present:         Mr. Kenneth McKibben
                      Corporate Equipment Engineer
                      Hayes Lemmerz International

2

I N D E X

                                                    PAGE
Witness:  JOHN ALLREAD

Examination by Ms. Bride ......................    4
Examination by Ms. Bowling ....................   71
Examination by Mr. Flaugher ...................   99
Examination by Ms. Pryor ......................  116
Further Examination by Mr. Bowling ............  119
Further Examination by Ms. Bride ..............  123
Further Examination by Mr. Bowling ............  124
Notarial Certificate and Costs ................  128

                  *   *   *

EXHIBITS previously marked and referenced herein

                E X H I B I T S

EXHIBIT          DESCRIPTION                IDENTIFIED

  16     Layout for Sutter                       51

  30     "Ironton Foundries Sand System
          Operations"                            59

  39     Drawings                                53

  40     Proposal and schematics                 91

  77     Letter, 3/13/92                        125

   R     Photos                                  72

(Original exhibits retained by the witness.)

                  *   *   *

Phonetic spelling:  (ph.)
Exactly as stated:  (sic)

3

|                 | JOHN ALLREAD,                                              |
|---|---|
| 1 | JOHN ALLREAD, |
| 2 | being first duly sworn to testify the truth, the whole |
| 3 | truth, and nothing but the truth, testified as follows: |
| 4 | EXAMINATION |
| 5 | BY MS. BRIDE: |
| 6 | Q  Good morning, Mr. Allread.  My name is Nancy Bride, |
| 7 |    and I'm from Greenebaum, Doll & McDonald.  I represent |
| 8 |    a company called Hayes Lemmerz in this present |
| 9 |    litigation, "Simpson v. Intermet, et al."  Could you |
| 10 |   please state your full name and address for the |
| 11 |   record. |
| 12 | A  My name is John Allread.  The address 2333 West |
| 13 |   Dearborn Street, Springfield, Missouri 65807. |
| 14 | Q  Where are you currently employed? |
| 15 | A  Well, self-employed, I guess you'd say. |
| 16 | Q  How long have you been self-employed for? |
| 17 | A  Since about a year and a half now, year. |
| 18 | Q  What is the nature of your self-employment? |
| 19 | A  Development, residential development. |
| 20 | Q  And is that what you've been doing for the last year |
| 21 |   and a half? |
| 22 | A  Um-hmm. |
| 23 | Q  Just so the court reporter can make an accurate |
| 24 |   record, if you could just say "yes" or "no" on the |
| 25 |   record instead of -- |

4

**Page 93**

1  A  About two or three steps is all, or two steps, yeah.
2  Q  -- around to the side or back of the machine, activate
3     the hydraulic solenoid valve. This would strip the
4     cope up, again, locking it to the gas head. Are you
5     familiar with that process?
6  A  No. But I -- what I remember is that he hit a button.
7     He didn't have to -- you know, he didn't actually --
8     are you talking, when he says a solenoid, he uses a
9     piece of welding wire to, you know --
10 Q  Yes.
11 A  I don't think so. I don't remember that. I wouldn't
12    be part of something like that. No. Not to have to
13    do it that way.
14 Q  Would it have been capable or would it have been
15    within Intermet's maintenance capabilities to put that
16    hydraulic, a manual solenoid valve in any location
17    around the Sutter or around the control panel? They
18    wouldn't necessarily have to put it on the back side
19    where the operator would have to leave his station,
20    would they?
21 A  We would have that capability, yes.
22 Q  Do you know, as we sit here today, what I'm talking
23    about, as I mentioned it?
24 A  I don't ever remember the operator ever having to go
25    in the back of the machine to do what you're

**Page 94**

1     describing. He could do everything from that panel
2     right there. (Pointing at documentation.)
3  Q  Let me ask you to assume that this is the case: That
4     when the cope is lowered from the gas head and
5     stickers are to be removed from the top of the cope,
6     that to activate or to strip the cope back up to the
7     gas head, I want to ask you to assume that the
8     operator has to leave the operator station, go to the
9     front side, what the employees call the front side of
10    the Sutter machine, activate a hydraulic solenoid
11    valve to raise the cope up. I'm going to ask you to
12    further assume that from the point of that activation
13    of that hydraulic valve, visibility from the operator
14    to the helper is very limited. Now, I'll ask you,
15    based on those assumptions, is that a situation which
16    you would approve as far as the operation of this
17    Sutter machine?
18        MS. PRYOR: Objection.
19        You can go ahead and answer.
20        THE WITNESS: I know where he's leading me, you
21    know, but the -- the point here is that --
22        MS. BRIDE: Now he's leading you.
23        THE WITNESS: Yeah, exactly. It's like the
24    management business about, you know, condoning it.
25 A  First of all, you know, I've watched the operation

**Page 95**

1     many times. I don't ever remember seeing it that way,
2     okay? Second of all, between what you call the helper
3     and the machine operator, there is not a limited --
4     you know what I mean? As I remember, there was --
5     there was no problem being able to see. And so I
6     guess what's really happened here is that the guy got
7     himself in a position, and the helper hit a button or
8     something he shouldn't have done, you know. That's
9     what you're basically saying. I don't think that
10    could happen that way.
11 Q  (By Mr. Bowling) Okay. You don't think it can
12    happen. But what I'm asking you to is respond to my
13    question based on my assumptions. If my assumptions
14    aren't true, my question's no good, okay?
15        So based on the assumptions that I've asked you to
16    accept -- I'll get it sooner or later --
17        MR. McKIBBEN: I'm going to help you.
18        THE WITNESS: He's going to help. You are from
19    Ironton. I can tell.
20        MR. BOWLING: Thank you very much.
21 A  I --
22 Q  (By Mr. Bowling) My question is being premised on my
23    assumptions, and I'm asking you to assume that for the
24    purposes of stripping the cope back up against the gas
25    head, that the operator would have to leave that

**Page 96**

1     operator's control panel, walk to the side or the
2     front of the machine, and activate the hydraulic valve
3     manually with a -- what they use as a fire
4     extinguisher pin or a grenade pin, as it's being
5     called, and that further, that the visibility, between
6     that point of operation and the machine to where the
7     helper is standing, is limited. Would that be a
8     situation to which you would approve --
9  A  No, I would not approve of that.
10 Q  You would -- would it be more reasonable to have that
11    manual activation of that valve in a point either near
12    or at the control panels?
13 A  Yes. But, it's a -- it's a basic, intimate
14    responsibility to make sure that happens, okay?
15    Not -- and that's why I get offended, because I don't
16    think that I would have allowed something like that.
17    And maybe I didn't back then. I don't know what's
18    happened from the time I left.
19 Q  When we're talking about the location of these locks
20    and the location of various tagout portions --
21        MR. BOWLING: It's getting really hot in here.
22        THE WITNESS: It is. It truly is.
23        MR. BOWLING: You don't have to take that down.
24        (Pause in proceedings.)
25        THE WITNESS: On the record, I'm about to make

**Page 97**

1   a statement.
2       MR. BOWLING: Okay. Make your statement.
3   A   Here's the deal. Any employees that I ever talked to,
4       okay, meaning all the way for the last 30 years -- and
5       I tried to get this philosophy across to everybody,
6       and I'll get it across to you guys. Okay? You never
7       push a button unless you know what's going to happen
8       on the other end of it. Never. Because you may have
9       somebody's life involved. Now, I'm sure that this
10      helper was told that. Whether he remembers it or not,
11      I'm sure he was told it. Don't mash the button unless
12      you know what's going to happen.
13          The most scary thing that ever happened to me 30
14      years ago is I energized a fan from down on the first
15      floor, Central Foundry, Defiance, up on the roof. And
16      then as I hit the button, I thought to myself, My God,
17      what happens if the two millwrights I sent up there
18      are working on this thing? Never, ever again did that
19      ever happen. And I was able to convey that philosophy
20      across to everybody. Never touch the button unless
21      you know what's going to happen on the other end of
22      that.
23  Q   (By Mr. Bowling) And with part of that philosophy and
24      the operation of the Sutter machines that we've been
25      talking about today, it would make very much sense,

**Page 98**

1   then, would it not, to have the hydraulic manual valve
2   in a location where the operator can easily see his
3   helper?
4   A   And I've taken a position, a point to you is that that
5       operator should never hit, no matter where it's
6       located, if it's located in this room and Ironton is
7       500 miles from here, don't hit the button unless you
8       know what's going to happen.
9   Q   The point being, would you agree with my question?
10  A   No, I don't necessarily agree with it, because in all
11      cases you can't locate something, you know, where you
12      think it should be located.
13  Q   But in this case, do you believe Ironton Iron's
14      maintenance department had the abilities to locate
15      that manual hydraulic valve in any location?
16          MS. PRYOR: Objection.
17  A   Yeah, I'd have to go look for myself. I don't know
18      that for sure. You know, I can't remember.
19  Q   (By Mr. Bowling) But as part of the installation of
20      the machines, the Sutter machines that we're talking
21      about, there was a concerted effort, not only on your
22      part but with the employees, maintenance, everyone
23      affected with the location, there was a great effort
24      made in locating or choosing a location --
25  A   Attempting to, yes.

**Page 99**

1       MR. BOWLING: I think that's all I have for
2   now. We want to play musical chairs again.
3                   EXAMINATION
4   BY MR. FLAUGHER:
5   Q   Mr. Allread, you've been very patient today, and we
6       appreciate your patience in the face of a very hot
7       room filled with lawyer types. My name is Rob
8       Flaugher. I introduced myself to you earlier. I
9       represent a company called Georg Fischer Disa, who, I
10      think you've indicated earlier, you're familiar with;
11      is that right?
12  A   Yes.
13  Q   I'm going to go back through just a couple of things
14      that you talked about earlier to expand on it somewhat
15      so that I've got a full understanding. Earlier in
16      your testimony, you indicated that before you started
17      your consulting busi -- or before you started your
18      residential development business, you did one year of
19      consulting, and I thought you said with Georg Fischer.
20      Is that the Georg Fischer Disa that I'm here today
21      representing; do you recall?
22  A   It is Georg Fischer, but the parent company. It would
23      be the boss of your boss. They're located -- see,
24      Georg Fischer is a corporation that's approximately a
25      three-billion-dollar-a-year corporation made up of six

**Page 100**

1   divisions, one of which is equipment supply division.
2   Makes the Disamatic, horizontal, makes blast equipment
3   and so on and so on. They are located in
4   Schaffhausen, Switzerland.
5   Q   Now, what was the nature of your consultation work for
6       them?
7   A   They decided they wanted to build a foundry, an
8       aluminum permanent mold foundry in the United States,
9       and they were looking not only for a location, but
10      they felt they had a contract, strangely enough, on
11      the F150 aluminum -- it's a casting that took the
12      place of the "I" beam, which became a ductal iron
13      casting, which then they wanted it put into aluminum.
14      So we did a lot of preliminary work. I went over to
15      Austria, where they have a duplicate of this foundry,
16      familiarized myself with it. Then came over here and
17      priced out a lot of equipment to build the foundry
18      either in Battle Creek, Michigan, or in Kalamazoo,
19      Michigan, or someplace close to Columbus, Ohio.
20  Q   Who did you report to in your consultation work with
21      them?
22  A   A gentleman by the name of Dr. Klaus Horning.
23  Q   Is he in the States or is he in Switzerland?
24  A   He was the head of all of the aluminum operations for
25      Disamatic -- I mean for Fischer, and also was the head