# EXHIBIT D

MC GINNIS & ASSOCIATES, INC.
614.431.1344    COLUMBUS, OHIO    800.498.2451
www.mcginniscourtreporters.com

1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                   SOUTHERN DISTRICT OF OHIO
 3                        EASTERN DIVISION
 4                             - - -
 5
     Carl G. Simpson and Bonnie    )
 6   Reed Simpson,                 )
     Co-Administrators of the      )
 7   Estate of Carl D. Simpson,    )
                                   )
 8            Plaintiffs,          )
                                   )
 9       vs.                       )  Case No. C-1-00 0014
                                   )  Judge J. Dlott
10   Intermet Corporation, et al., )
                                   )
11            Defendants.          )
12                             - - -
13            Deposition of Gary P. Maul, Ph.D., a witness herein,
14   called by the Defendant Georg Fischer DISA, Inc. fka Sutter
15   Products Company for examination under the applicable rules of
16   Federal Civil Court Procedure, taken before me, Linda D. Riffle,
17   Registered Diplomate Reporter, Certified Realtime Reporter and
18   Notary Public in and for the State of Ohio, pursuant to notice
19   and stipulations of counsel hereinafter set forth, at the
20   offices of the deponent, The Ohio State University, 210 Baker
21   Systems Building, 1971 Neil Avenue, Columbus, Ohio, on Monday,
22   November 5, 2001, beginning at 12:45 o'clock p.m. and concluding
23   on the same day.
24                             - - -
25
```

COPY TRANSCRIPT

99

MC GINNIS & ASSOCIATES, INC.
614.431.1344    COLUMBUS, OHIO    800.498.2451
www.mcginniscourtreporters.com

1   machine out of the line of sight of the -- of the operator
2   and -- and the helper, I mean, and you've got -- you've created
3   a situation there where no guard could -- I mean, if you -- if
4   you fire something up and somebody's in the machine, a guard
5   isn't going to take care of that situation.
6       Q.   That's right.  Your report says that an energy stop
7   button should have been near the helper; that is, near
8   Mr. Simpson's position?
9       A.   That's correct.
10      Q.   Where would that stop button have been, in your
11  opinion, best placed?
12      A.   Well, I think there should have been a stop button
13  certainly in the helper's station, along with a large emergency
14  stop located on a panel that would have been easy to get to and
15  hit in the case of an accident or an emergency, to at least get
16  the electrical power off and do something in terms of releasing
17  the hydraulic pressure.  I mean, there's all kinds of ways of
18  doing that.
19      Q.   If Mr. Simpson had both arms inside the machine, he
20  could not have reached any stop button that might have been
21  placed outside, could he?
22      A.   Well, it's -- I think it's foreseeable that if he --
23  the machine started to move and he had one hand free and he
24  could get it loose, even.
25           The point is, there were absolutely no methods of --

100
MC GINNIS & ASSOCIATES, INC.
614.431.1344    COLUMBUS, OHIO    800.498.2451
www.mcginniscourtreporters.com

1   of emergency stop. I mean, there's no way you were going to
2   stop this machine except from the master stop on the control
3   panel, and I'm not certain that would have shut everything off,
4   and it certainly wouldn't have placed it in a zero energy state.
5       Q.   But an emergency stop button wouldn't have helped
6   Mr. Simpson if he had both arms inside the machine --
7       A.   I can't say that.
8       Q.   -- and came down --
9       A.   I can't say that because, as you indicated, I don't
10  have enough facts about the injury, so I can't say that.
11      Q.   If Mr. Simpson had both hands, his body and both arms
12  inside the machine when it actuated, then he could not have
13  reached the stop button, could he?
14      A.   I'd have to say probably no.
15      Q.   Let's talk about die blocks for a moment. Are there
16  any kind of principles expressed in any of your textbooks or
17  anything about how to design a die block?
18      A.   No. There's a lot of common knowledge about die
19  blocks. I'd have to go back through and -- Let's see, yeah,
20  there is, in fact, in the "Machine Guarding Handbook" there's
21  information about the use of die blocks. And I believe in the
22  other one, which I don't know where it went to now -- oh, I
23  believe there's something in that one about die blocks.
24      Q.   The books that everybody else are reading.
25           Okay. Thanks.

MC GINNIS & ASSOCIATES, INC.
614.431.1344    COLUMBUS, OHIO    800.498.2451
www.mcginniscourtreporters.com

124

1  machine able to operate in a manner that produces the product as
2  required?
3      A.   You could still operate the machine.
4      Q.   But --
5      A.   You may not produce a good part.
6      Q.   Exactly. So the sticker is something that has to be
7  cured or rectified in order to produce a good part, correct?
8      A.   That's correct.
9      Q.   And it sounds as though in order to cure or rectify
10 that situation, it requires a situation where the employees
11 must, on occasions, go beyond guards if there were any guards
12 and place themselves in a possible pinch point, correct?
13     A.   That could very well be, yes.
14     Q.   And, in fact, when I was reading your books, there
15 seems to be a differentiation between guarding and lockout
16 procedures.
17     A.   Correct.
18     Q.   And lockout procedures are -- seem to be something
19 that needs to be done in situations when you need to bypass the
20 guard in order to access certain aspects of the machinery for
21 some sort of maintenance, whether it be in the production phase
22 or maintenance to the machine such as lubricating a bearing.
23     A.   Yes. My -- My general sense of lockout is that
24 that's -- in all the situations I have been involved, it's
25 pretty much relegated to the maintenance-type employee and not

125
MC GINNIS & ASSOCIATES, INC.
614.431.1344     COLUMBUS, OHIO     800.498.2451
www.mcginniscourtreporters.com

1  the production operator. The guarding, the die blocks, little
2  things you do with e-stops are things that you give to the
3  production operator to keep them safe while they have to make
4  some minor adjustment.
5       Q.   The whole idea of guarding, though, is to keep the
6  person outside of the pinch point process?
7       A.   While the machine is operating, yes.
8       Q.   Exactly. And then there are situations when you have
9  to put yourself inside the pinch point and go inside the guard
10 to access something that cannot otherwise be accessed outside of
11 where the guard is placed?
12      A.   Correct.
13      Q.   And for that reason is why you have a lockout; isn't
14 that correct?
15      A.   Well, you have lockout when you're going to tear into
16 the machine to -- to do some major servicing.
17      Q.   Well, if you're going to put yourself inside of a
18 pinch point purposefully for purposes of necessity, however you
19 want to characterize it, you need a lockout/tagout system, don't
20 you?
21      A.   You could. But --
22      Q.   The guards have -- The guard's no longer going to
23 protect you, is it?
24      A.   The guard will no longer protect me, but at that point
25 I could do something like cut the electrical energy, bleed off

126
MC GINNIS & ASSOCIATES, INC.
614.431.1344    COLUMBUS, OHIO    800.498.2451
www.mcginniscourtreporters.com

1  the hydraulics very quickly with something like a dump valve and
2  stick a die block in there.
3      Q.   And when he was going in there, and let's assume going
4  in there to do something about a sticker, he was necessarily
5  placing himself inside of the pinch point, wasn't he?
6      A.   Yes, he was.
7      Q.   And whether there be a safety gate or a light or
8  something else, it would have been inside of the guarding area,
9  wouldn't it?
10     A.   Yes.
11          MR. MUNSELL:  That's all the questions I have.
12          THE WITNESS:  Okay.
13          MR. BARTY:  Nothing further.
14                             - - -
15                      FURTHER EXAMINATION
16 BY MR. LAMBERT:
17     Q.   I have a question for my knowledge as much as anything
18 to follow up on that.
19          If you have a machine that is locked -- that has a
20 gate light or guarding on it that is locked out for the purpose
21 of the employee entering the machine for whatever reason, if
22 that -- if the other employee attempts to energize the machine
23 from the lockout position while the gate light or guarding is
24 infiltrated or crossed by the employee, does that prohibit the
25 re-energizing or the turning on the machine, in effect?